UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

MICHELLE MCMILLEN, Individually and                                    Plaintiff
as Administratrix of the ESTATE OF
GYNNYA MCMILLEN

v.                                          Civil Action No. 3:16-cv-00558-RGJ-CHL

REGINALD WINDHAM, ET AL.                                          Defendants

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiff Michelle McMillen, individually and as administratrix of Gynnya McMillen's estate, sues Defendants Youth Worker Supervisor, Reginald Windham ("Supervisor Windham"); Youth Worker Supervisor, Victor Holt ("Supervisor Holt"); Commissioner, Bob Hayter ("Commissioner Hayter"); Deputy Commissioner Program Director, Mark Cook ("Deputy Commissioner Cook"); Facility Superintendent, Michelle Grady ("Superintendent Grady"); Assistant Superintendent, Michael Price ("Assistant Superintendent Price"); Youth Services Program Supervisor, Brent Kimbler ("Program Supervisor Kimbler"); Counselor, Vicki Mullins ("Counselor Mullins"); Youth Worker, Lashae Newby ("Newby"); Youth Worker, Chris Johnson ("Chris Johnson"); Youth Worker, Kevin Johnson ("Kevin Johnson"); Youth Worker, Lisa Rivers ("Rivers"); and Youth Worker, Loretta Gaudern ("Gaudern") for alleged violations of the United States Constitution and Kentucky law. [DE 1, Compl.]. All Defendants except Supervisor Windham, Supervisor Holt, and Chris Johnson now move to dismiss under Fed. R. of Civ. Proc. 12(b)(6) or for summary judgment under Rule 56. [DE 59; DE 61; DE 63; DE 65; DE 114; DE 123; DE 128]. Defendants also move to exclude or limit expert testimony by David Roush [DE

1

115; DE 125; DE 131] and for leave to file videos under seal [DE 126; DE 129]. Briefing is complete, and the motions are ripe.

For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART AS MOOT** the Motion to Dismiss on Behalf of Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady [DE 59], the Motion to Dismiss and/or for Summary Judgment on Behalf of Program Supervisor Kimbler [DE 65], the Motion for Summary Judgment on Behalf of Newby, Counselor Mullins, and Program Supervisor Kimbler [DE 123], and the Motion for Summary Judgment by Defendants Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady [DE 128]; **DENIES AS MOOT** the Motion to Dismiss on Behalf of Defendants Newby and Counselor Mullins [DE 63] and the Motion for Partial Summary Judgment or to Hold Action in Abeyance [DE 114]; **GRANTS IN PART AND DENIES IN PART** the Motion for Summary Judgment by Gaudern, Kevin Johnson, Assistant Superintendent Price, and Rivers [DE 61] and the Motions to Exclude or Limit Expert Testimony by David Roush, Ph.D. [DE 115; DE 125; DE 131]; and **GRANTS** the Motions for Leave to File Videos Under Seal [DE 126; DE 129].

## BACKGROUND

On Sunday, January 10, 2016, the Shelbyville Police Department responded to a domestic dispute between sixteen-year-old Gynnya McMillen ("Gynnya") and her mother, Michelle McMillen ("McMillen"), at their home in Shelbyville, Kentucky. [DE 1 at ¶ 27]. After the police arrested Gynnya without a warrant, a Shelby County District Court Judge ordered Gynnya's detention at the Lincoln Village Regional Juvenile Detention Center ("Lincoln Village"), a Kentucky Department of Juvenile Justice ("KYDJJ") facility, until her scheduled court date on Monday morning. [*Id.* at ¶ 28].

When Gynnya arrived at Lincoln Village, she went through an intake process that included a search for contraband. [*Id.* at ¶¶ 88–89]. Gynnya refused to remove her hoodie jacket, telling Chris Johnson, Kevin Johnson, Gaudern, and Rivers to "get out of [her] face." [DE 61-5 at 596]. Supervisor Holt received telephone authorization from Assistant Superintendent Price to restrain Gynnya. [DE 79 at 800–01]. After hanging up the phone, Supervisor Holt "yell[ed] and point[ed] at Gynnya and then repeatedly slap[ped] the intake desk." [*Id.*]. Chris Johnson restrained Gynnya's arms, after which Gaudern frisked Gynnya. [*Id.*; DE 61-1 at 580]. Gynnya "became combative and began kicking her legs," striking Chris Johnson in the midsection. [*Id.*]. Chris Johnson and Kevin Johnson applied more pressure and forced Gynnya to the ground. [DE 79-1 at 811]. Gynnya told them she was in pain [DE 79-2 at 812], and an internal investigation of the incident later revealed that Gynnya suffered injuries to her thigh and leg area [DE 79-4 at 817]. When Gynnya said she was in pain, Kevin Johnson replied that "none of this would have happened if [you] had complied with the search." [DE 79-2 at 812]. Defendants completed the search when Gynnya stopped resisting. [DE 61-1 at 580].

Defendants then placed Gynnya in a cell ("Room 423"). [DE 1 at ¶ 31]. Gaudern removed the mattress pad from Gynnya's bed, leaving Gynnya alone with a metal bed frame and without a mattress pad or blanket. [DE 1 at ¶ 31; DE 1-11, Ex. J; DE 79 at 801].

As part of Lincoln Village's rules and regulations, Lincoln Village employees needed to conduct bed checks at set intervals, including at least every fifteen minutes during sleep hours. [DE 1 at ¶ 22; DE 1-4 at 53]. During the bed checks, employees were to verify that the resident was safe and secure in the room, and then document the check on the Unit Room Observation Sheet. [*Id.*]. In 2013, Assistant Superintendent Price held a meeting on the importance of bed checks, including the need to make sure the youth was breathing. [*Id.* at ¶ 82; DE 1-27]. Assistant

Superintendent Price stated "that he would not stand behind anyone who failed to do their jobs" and that staff conducting the bed checks "should stop at the door of each resident and make sure the youth is breathing." [DE 1-27].

Defendants placed Gynnya in Room 423 at 6:22 a.m. on January 10, 2016 and removed her later that day at 3:44 p.m. [DE 1 at ¶ 28]. During that time, the Lincoln Village staff failed to perform and falsified records for twenty-three required bed checks of Room 423. [*Id.* at ¶ 37]. From the time Gynnya returned to Room 423 at 5:19 p.m. until 11:39 p.m., the Lincoln Village staff failed to perform and falsified records for another twelve required bed checks of Room 423. [*Id.* at ¶ 38]. And from 10:35 p.m. to 11:39 p.m., Supervisor Windham personally failed to perform four required bed checks. [*Id.* at ¶ 39].

At 11:39 p.m., Supervisor Windham heard coughing coming from Room 423. [*Id.* at ¶ 40]. He went "to check on [Gynnya] to make sure she had not thrown up and was choking or something like that." [*Id.*] In conducting the check, Supervisor Windham looked through the narrow slit in the door for about 18 seconds, during which he saw Gynnya turn onto her right side and her left leg hanging off the bed at the knee. [*Id.* at ¶ 42–43]. Supervisor Windham then returned to his desk. [*Id.* at ¶ 43]. He falsified twenty-four more bed checks between the time he checked on Gynnya at 11:39 p.m. and the time Supervisor Holt and Youth Worker Chris Johnson discovered Gynnya the next morning. [*Id.* at ¶ 49].

At about 9:55 a.m. the next morning, Supervisor Holt and Youth Worker Chris Johnson entered Room 423 and tried unsuccessfully for several minutes to awaken Gynnya for transport to Shelby County District Court. [*Id.* at ¶¶ 70–71]. Nurse Jennifer Swiney then arrived to assess Gynnya, who was still unresponsive. [*Id.* at ¶ 72]. Swiney and Nurse, Paula Maupin, checked Gynnya's pulse. Swiney called 911 dispatch and said Gynnya was cold, stiff, and without

respirations or vital signs. [*Id.* at ¶¶ 72–73]. Maupin, with Swiney's assistance, performed CPR on Gynnya. [*Id.* at ¶ 74]. Emergency personnel arrived about ten minutes later and assessed her condition. [*Id.* at ¶ 75]. She was dead. Hardin County Coroner William H. Lee, Jr. arrived and, with emergency personnel, placed Gynnya in a body bag and removed her from the cell. [*Id.* at ¶ 76].

According to McMillen's medical expert, Dr. Schwartz, Gynnya died between 11:39 p.m. and 11:44 p.m. from long QT syndrome type 2 ("LQT2") based on a disease-causing mutation. [DE 1 at ¶ 43; DE 1-18 at 114]. Dr. Schwartz testified that before Gynnya's death, there would have been nothing to indicate that cardiac arrest or death was likely to occur. [DE 146-1 at 2464]. LQT2 patients tend to die at rest or nighttime due to a cardiac rhythm called ventricular fibrillation, which produces a significant drop in blood pressure. [DE 1-18 at 114]. As blood pressure decreases and the oxygen perfusion of the brain decreases progressively, gasping occurs, which is often interpreted as coughing when heard from a distance. [*Id.*]. Dr. Schwartz suggested that Gynnya may have survived had she received "prompt resuscitative intervention" between the time she began exhibiting symptoms around 11:39 p.m. and when she died within the next five minutes. [*Id.* at 114–15].

The Justice Cabinet's Internal Investigations Branch investigated the circumstances surrounding Gynnya's death. In a Memorandum of Concern, investigator Ed Jewell concluded that the "office not only substantiated that six employees at [Lincoln Village] did not provide appropriate supervision, this office also identified other issues that in this investigator's opinion contributed to what can only be described as a breakdown in staff supervision of" Gynnya. [DE 1-8 at 77]. Among other things, Jewell concluded that there was a systematic falsification of room observation forms, including that the "staff missed and falsified sixty-five bed checks" around the

time of Gynnya's death. [*Id.* at 79; DE 1 at ¶¶ 36–39]. Jewell also concluded that "[t]his systematic breakdown led to staff possibly not noticing [Gynnya] in a medically stressed state" and, at the very least, the "staff would have noticed [Gynnya] was unresponsive earlier than when she was discovered." [*Id.*].

McMillen, individually and as administratrix of Gynnya's estate, sued Supervisor Windham, Supervisor Holt, Commissioner Hayter, Deputy Commissioner Cook, Superintendent Grady, Assistant Superintendent Price, Program Supervisor Kimbler, Counselor Mullins, Newby, Chris Johnson, Kevin Johnson, Rivers, Gaudern, and the Commonwealth of Kentucky for alleged violations of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983 and various Kentucky laws. [DE 1]. By Agreed Order the Court dismissed the claims against the Commonwealth of Kentucky and Defendants in their official capacities. [DE 22].

## DISCUSSION

### I.     Motions to Dismiss

Commissioner Hayter, Deputy Commissioner Cook, Superintendent Grady, Counselor Mullins, Newby, and Program Supervisor Kimbler have moved to dismiss under Rule 12(b)(6). [DE 59; DE 63; DE 65]. McMillen agrees to dismiss voluntarily several claims, including her excessive force and medical-needs claims (Counts I and II) against Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady. [DE 78 at 725]. She also agrees to dismiss voluntarily her negligence (Count IV) and negligence–per se (Count V) claims against Commissioner Hayter and Deputy Commissioner Cook. [*Id.* at 728]. Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady had moved to dismiss those claims. [DE 59 at 558–63]. Defendants' motion to dismiss is therefore granted as to Counts I and II, and Counts IV and V are dismissed for Commissioner Hayter and Deputy Commissioner Cook.

McMillen also agrees to dismiss voluntarily her excessive force claim against Program Supervisor Kimbler. [DE 80 at 833]. Program Supervisor Kimbler had moved to dismiss that claim as well. [DE 65 at 627–628]. Program Supervisor Kimbler's motion to dismiss Count I is therefore granted.

Commissioner Hayter, Deputy Commissioner Cook, Superintendent Grady, Counselor Mullins, Newby, and Program Supervisor Kimbler also argue in their motions to dismiss that they are entitled to qualified immunity. [DE 59 at 557–62; DE 63 at 612–18; DE 65 at 624–35]. But "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's 'entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point,' . . . that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (internal quotation marks and citations omitted) (alteration in original). Because Defendants assert the same qualified immunity defenses in their motions for summary judgment, the Court will consider qualified immunity as part of its summary judgment analysis.

## II. Motions for Summary Judgment

### A. Standard

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Factual differences are not considered material unless the differences are such that a reasonable jury could find for the

party contesting the summary judgment motion." *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008). The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252.

## B. Discussion

### 1. Excessive Force (Count I)

#### a. Gaudern, Kevin Johnson, and Rivers, and Assistant Superintendent Price

McMillen asserts that Gaudern, Kevin Johnson, Assistant Superintendent Price, and Rivers (collectively, the "Intake Staff") violated the Fourth Amendment by depriving Gynnya of her right to be free from unreasonable search, seizure, and punishment as a pretrial detainee. [DE 1 at ¶¶

84–95].[1]  The Intake Staff assert that qualified immunity protects them from McMillen's § 1983 claims.  [DE 61].[2]

"Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).  It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  When advanced by a defendant, qualified immunity is a threshold question of law appropriately determined on a motion for summary judgment.  *Harlow v. Fitzgerald*, 457 U.S. 800 (1983).  "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The plaintiff bears the ultimate burden of proof in establishing that a defendant has no right to qualified immunity.  *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).  That said, in moving for summary judgment based on qualified immunity, a defendant must first show "facts to suggest that he acted

---

[1] McMillen also argues that summary judgment is premature because the parties have been unable to engage in significant discovery.  [DE 79 at 803].  If a plaintiff requires additional discovery to respond to a motion for summary judgment, he must show why such discovery is necessary, such as by submitting an affidavit that states "with 'some precision the materials he hopes to obtain with further discovery, and exactly how he expects those materials would help him in opposing summary judgment.'" *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004) (quoting *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996)).  McMillen has not made such a showing, and there is thus no basis for determining the motion is premature.

[2] McMillen argues that Gaudern, Kevin Johnson, and Rivers do not move for summary judgment on Counts IV or V, and that Assistant Superintendent Price has not moved for summary judgment on Counts II, III, IV, V, VI, or IX.  [DE 79 at 799–800].  This is incorrect.  While the Intake Staff's motion only specifically discusses Count I (excessive force), their motion suggests that they move to dismiss "all claims against them under 42 U.S.C. § 1983" and "all state law claims against them."  [DE 61 at 576].

within the scope of his discretionary authority during the incident in question." *Id.* The burden then shifts to the plaintiff to show "that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct." *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017). If "undisputed facts show that the defendant's conduct did indeed violate clearly established rights[,]" or "if there is a factual dispute . . . involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights[,]" a court must deny summary judgment. *Gardenhire*, 205 F.3d at 311 (quoting Poe v. Haydon, 853 F.2d 418, 425–26 (6th Cir. 1988) (citations omitted)).

The Supreme Court requires a two-pronged approach when resolving questions of qualified immunity, although courts may decide the order in which to address these prongs "in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. First, the Court must decide whether a plaintiff has presented facts sufficient to find a violation of a constitutional right. *Id.* at 232. Second, the Court must decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.* Thus, qualified immunity applies unless the official's conduct violates a clearly established constitutional right. *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The parties dispute both prongs. The Intake Staff argue that no violation occurred because they had a right to conduct an intake search and the force used in effectuating that search was objectively reasonable. [DE 61-1 at 581–84]. They also argue that there is no law clearly establishing that they acted improperly. [*Id.*]. McMillen asserts that the Intake Staff behaved

unreasonably in Gynnya's intake and that clearly established law put the Intake Staff on notice that they were violating Gynnya's Fourth Amendment rights.  [DE 79 at 805–08].

*i.    Constitutional Violation*

 "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Generally, "[t]he Fourth Amendment's prohibition against unreasonable seizures bars excessive force against free citizens . . . while the Eighth Amendment's ban on cruel and unusual punishment bars excessive force against convicted persons," and the Fourteenth Amendment bars excessive force when neither category applies. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (citations omitted).

When authorities arrest an individual without a warrant, the Fourth Amendment's reasonableness standard applies until a probable-cause hearing occurs, after which the Fourteenth Amendment's more-stringent "shocks-the-conscience" standard applies. *Aldini v. Johnson*, 609 F.3d 858, 866 (6th Cir. 2010) (citing *Bell v. Wolfish*, 441 U.S. 520, 536 (1979)).  This is because "the probable-cause hearing is a judicial proceeding that affects the 'legal status' of the arrestee, constitutionally authorizing his detention throughout the proceedings against him, just as a guilty verdict affects his 'legal status' by authorizing his detention for the duration of his sentence." *Id.* "Additionally, establishing the line between Fourth and Fourteenth Amendment protection at the probable-cause hearing creates an incentive to hold the hearing as soon as possible, which is certainly beneficial to the judicial process." *Id.* at 866–67 (citing *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 58 (1991)).

McMillen identifies the Fourth Amendment's prohibition against unreasonable search and seizure as the allegedly infringed right.  [DE 1 at ¶ 86].  Law enforcement arrested Gynnya without

a warrant and ordered her detained until her court date. [*Id.* at ¶¶ 27-28]. Because no probable-cause hearing occurred, the Court analyzes these facts under the Fourth Amendment's reasonableness standard.

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell*, 441 U.S. at 559 (citations omitted). In the context of a detainee search, courts must "examine the scope, manner, and location of the search—as well as the justification for initiating it—in order to assess the degree to which it invaded the [detainee's] right to privacy." *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 574 (6th Cir. 2013) (citing *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 322 (2012)). It must "next evaluate the need for the search, giving due deference to the correctional officer's exercise of her discretionary functions. Finally, [it] determine[s] whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion." *Id.*

The Supreme Court has conveyed that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547. "Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies." *Florence*, 566 U.S. at 322. This is particularly true during the initial intake of a detainee. Indeed, the Supreme Court has consistently found invasive searches intended to keep contraband from entering detention facilities objectively reasonable. *See, e.g.*, *id.* at 334–35 (rectal searches permissible for all detainees, even those detained for minor offenses); *Bell*, 441 U.S. at 520 (cavity searches).

The search here, which included only a frisk, was limited in scope and justified by the legitimate interest of keeping contraband out of the detention center. Thus, the Intake Staff did not violate Gynnya's constitutional rights by performing an intake search.

McMillen also disputes how the Intake Staff carried out the search, including the force used. [DE 61-1 at 581–82; DE 79 at 808]. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 395).

Lincoln Village Standard Operating Procedure 702 ("SOP 702") establishes the appropriate procedures for the intake process. [*See* DE 61-4 at 590]. It states that "[t]he resident will be required to remove any outer coat or cap and place it on the floor next to him/her," and that "[a]ny juvenile cleared to be admitted and is combative, aggressive[,] or non-compliant will be secured in an Intake Holding Room until control is regained and the intake process can be safely completed." [*Id.*].

Other than as noted above, McMillen does not question the constitutionality of the intake procedures, which the Intake Staff violated by not securing Gynnya in a holding room until she complied. Rather, McMillen questions the constitutionality of the Intake Staff's actions in violating those procedures. *See Stoudemire*, 705 F.3d at 574.

When considering the acts of officials sued in their individual capacities, an official's violation of internal operating procedures does not, without more, amount to a constitutional

violation. *Id.* And while contrary to SOP 702, the Intake Staff's response to Gynnya's refusal to remove her hoodie jacket was an objectively reasonable method to maintain order and effectuate the intake search. The Intake Staff's decision to restrain Gynnya served the interests of maintaining institutional safety, particularly in light of Gynnya's belligerent behavior. *See Griffin v. Hardrick*, 604 F.3d 949, 954–55 (6th Cir. 2010) (no excessive force when officials performed a "leg-sweep maneuver" to subdue a non-compliant inmate); *Erby v. Ray*, 47 F. App'x 744, 745 (6th Cir. 2002) (upholding a cell extraction and the use of gas after an inmate refused to remove his hand from the food slot in his cell door); *Boyd v. Halley*, No. 3:16-CV-00697, 2017 WL 3453292, at *4 (M.D. Tenn. Aug. 11, 2017), *report and recommendation adopted*, No. 3:16-CV-00697, 2017 WL 4150460 (M.D. Tenn. Sept. 19, 2017). As a result, a reasonable jury could not find that the Intake Staff's use of force was excessive, and the use of force therefore did not violate Gynnya's Fourth Amendment rights.

The Intake Staff's decision to remove the mattress pad from Gynnya's cell is another matter, however. "The Sixth Circuit has long adhered to the view that the Fourth Amendment prohibits excessive force under certain pre-trial circumstances." *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 528 (6th Cir. 2018) (citing *McDowell*, 863 F.2d at 1306). The Fourth Amendment's prohibition on excessive force controls not only "the permissible *duration* of 'warrantless, post-arrest, pre-arraignment custody,'" but also "the *condition* of such custody." *Aldini*, 609 F.3d at 866 (quoting *Pierce v. Multnomah Cty.*, 76 F.3d 1032, 1043 (9th Cir. 1996)).

While the Fourth Amendment's reasonableness standard guides this case because there had been no probable-cause hearing, the Supreme Court's Fourteenth Amendment jurisprudence on pretrial detention is instructive. *See Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985) (analogizing "the eighth amendment rights of prisoners . . . to those of detainees under the

14

fourteenth amendment, to avoid the anomaly of extending greater constitutional protection to a convict than to one awaiting trial" (citations omitted)). The Constitution protects those in state custody from punishment because a "person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a judicial determination of probable cause as a prerequisite to the extended restraint of his liberty following arrest." *Bell*, 441 U.S. 520, 536 (internal quotation marks, citation, and alterations omitted). Thus, the Court has said that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham*, 490 U.S. at 395 n.10 (citing *Bell*, 441 U.S. at 535–539). To determine whether an action is a permissible restraint or an impermissible punitive measure, courts consider whether there is "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015).

McMillen asserts that the Intake Staff removed the mattress pad from Gynnya's cell to punish Gynnya for her failure to cooperate during the intake search. [*See* DE 1 at ¶¶ 31, 87; DE 1-11, Ex. J; DE 79 at 801].[3] Gaudern removed the mattress pad after a difficult intake process. [DE 79 at 800–01; DE 79-2 at 812]. In their responses and other filings, the Intake Staff have

---

[3] While Gaudern removed the mattress pad before Gynnya's confinement, government officials "can be held liable for failure to protect a person from the use of excessive force." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). "Generally speaking, a[n official] who fails to act to prevent the use of excessive force may be held liable when (1) the offic[ial] observed or had reason to know that excessive force would be or was being used, and (2) the offic[ial] had both the opportunity and the means to prevent the harm from occurring." *Id.* (citation omitted); *see also Durham v. Nu'Man*, 97 F.3d 862, 866–68 (6th Cir. 1996); *McHenry v. Chadwick*, 896 F.2d 184, 188 (6th Cir. 1990). Gaudern removed the pad before placing Gynnya in the cell, and thus other members of the Intake Staff had reason to know that it was removed. They also could have prevented the harm by returning the mattress pad when they realized it had been removed. Thus, if removal of the mattress pad amounts to excessive force, other members of the Intake Staff may be liable for failure to protect Gynnya from that excessive force.

offered no justification for the removal of the mattress pad moments before the Intake Staff placed Gynnya in the cell. Indeed, they have declined to address the issue.

The undisputed facts, considered with the Intake Staff's failure to explain its decision to remove the mattress pad after the search, present "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective." *Kingsley*, 135 S. Ct. at 2473–74. And because of their silence on the matter, the Intake Staff offers no "countervailing governmental interest at stake" to counterbalance the intrusion into Gynnya's Fourth Amendment right to be free from unreasonable custodial conditions. *Graham*, 490 U.S. at 396; *Aldini*, 609 F.3d at 866. While, for the reasons discussed, the intake process was itself proper, the difficult intake process and Intake Staff's later behavior are objective evidence that the Intake Staff removed the mattress pad to punish Gynnya. The Supreme Court's Fourteenth Amendment jurisprudence forbidding officials from punishing pretrial detainees not yet adjudged guilty of a crime is particularly compelling in cases like this, where the detainee had not even had a probable-cause hearing. *See Roberts*, 773 F.2d at 723.

For these reasons, the Intake Staff did not violate the Constitution during the intake search, but a jury could find that the Intake Staff behaved unreasonably when they removed the mattress pad from Gynnya's cell.

### ii. *Clearly Established Right*

Even if an official's behavior violates the Constitution, however, qualified immunity applies unless the official's conduct violates a clearly established right. *Pearson*, 555 U.S. at 232. The official's conduct violates clearly established right "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear'" that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741

(2011) (citing *Creighton*, 483 U.S. at 640). A case directly on point is not required. *Id*. Instead, existing precedent must place the constitutional question beyond debate. *Id*. "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citation omitted).[4]

In examining "existing precedent," the Court looks "first to decisions of the Supreme Court," then to Sixth Circuit cases and "decisions of other courts within the circuit, and then to decisions of other Courts of Appeal." *Andrews v. Hickman Cty*., 700 F.3d 845, 853 (6th Cir. 2012). Although the conduct at issue in those cases need not be identical, the legal precedent "must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion" that the conduct is unlawful. *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012).

In evaluating whether a right is clearly established, courts cannot "define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742, 131 S.Ct. 2074. Instead, "[t]he 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Dist. of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018). The officer's conduct must be unlawful not in the abstract but "in the situation he confronted." *Id.* Of course, there can be the rare "obvious case," where the unlawfulness of the officer's conduct is clear enough even though existing precedent does not address similar circumstances. *Id*., citing *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583

---

[4] The Supreme Court has recognized "that officials can still be on notice that their conduct violates established law even in novel factual circumstances" and has "rejected a requirement that previous cases be 'fundamentally similar'" to the facts in a case to render qualified immunity inapplicable. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States v. Lanier*, 520 U.S. 259, 263 (1997)). As noted, however, the Court has more recently held that plaintiffs must identify existing precedent that places the legal question "beyond debate" to "every" reasonable officer, *al-Kidd*, 563 U.S. at 741, and has since appeared committed to that more-stringent standard. *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam).

(2004) (per curiam ). "But 'a body of relevant case law' is usually necessary to 'clearly establish' the answer' with respect to probable cause." *Id*. Thus, "[w]hether a defendant is protected by qualified immunity turns not on whether the defendant was on notice that his actions satisfied the elements of a particular cause of action, but instead on whether the defendant was on notice that his actions violated the laws of the United States." *Jackson v. City of Cleveland*, 920 F.3d 340, 372 (6th Cir. 2019); *see also Miller v. Maddox*, 866 F.3d 386, 395 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 2622 (2018); *Spurlock*, 167 F.3d at 1005–06 (finding that a right was clearly established even though that right was previously analyzed under the Fourteenth Amendment but was now properly analyzed under the Fourth Amendment). Here, although McMillen asserts violations of the Fourth Amendment, the Intake Staff will not be entitled to qualified immunity if precedent clearly establishes that they were on notice of the unlawfulness of their behavior under United States law, even if not the Fourth Amendment specifically.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Although the Eighth Amendment does not apply to pretrial detainees, these detainees have a right under the Fourteenth Amendment's Due Process Clause analogous to a prisoner's Eighth Amendment right to be free from cruel and unusual punishment. *See Bell,* 441 U.S. at 535 & n. 16; *Roberts,* 773 F.2d at 723. Pretrial detainees have a right to "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." *Ruiz-Bueno v. Scott*, 639 F. App'x 354, 362 (6th Cir. 2016), citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Supreme Court has instructed that "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention . . . the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell*, 441 U.S. at 535.

> Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense, however. Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

*Id.* at 537.  To determine whether conditions are punitive,  "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."  *Id.* (citing *Flemming v. Nestor*, 363 U.S. 603, 613 (1960)). On the other hand, "if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 538.

The test for evaluating alleged violations of the right to humane conditions of confinement has both an objective and a subjective component. *Farmer*, 511 U.S. at 834. The objective component requires showing a "sufficiently serious" deprivation that caused the denial of the "minimal civilized measure of life's necessities," while the subjective component requires showing a sufficiently culpable state of mind—one of deliberate indifference. *Id.* at 834 and 842. If the deprivation is based on an omission or failure to prevent harm, there must be evidence that the detainee was "incarcerated under conditions posing a substantial risk of serious harm." *Id*.

Here, as discussed above, there is no evidence the removal of the mattress was incident of some other legitimate governmental purpose and a reasonable jury could find removal of the

mattress was punishment. Yet as in *Farmer*, there must be both a deprivation so serious that it denies her "the minimal civilized measure of life's necessities" and evidence that prison officials' acts created "a substantial risk of serious harm," a phrase that the Court has treated as interchangeable with "an excessive risk to inmate health or safety." *Id*. at 837.

To begin with, McMillen does not point to precedent analogous to the removal of Gynnya's mattress pad that would show a violation of clearly established law. Because the burden is on McMillen to show that the Intake Staff's behavior violated a clearly established right, this alone warrants grant of summary judgment. *See Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017), *cert. denied sub nom. Shafer v. Padilla*, 138 S. Ct. 2582 (2018). Nor has McMillen put forth evidence demonstrating that removal of the mattress contributed to Gynna's heart problem or posed any other substantial risk of serious harm to Gynna's health.

The Sixth Circuit has held in an unpublished opinion that confinement to a cell without a mattress for a period of seven days, despite falling below minimal standards of decency, did not violate clearly established law because there was no evidence that such conditions posed a substantial risk of serious harm. *Ruiz-Bueno v. Scott*, 639 F. App'x 354, 362 (6th Cir. 2016).[5] Other federal courts have held that short-term deprivations of a mattress pass constitutional muster. *See Harris v. Connolly*, No. 5:14-cv-128, 2016 WL 676468, at *4 (W.D.N.C. Feb. 18, 2016) (collecting cases). That said, "frequent or long term deprivations" may be constitutionally problematic. *Gilland v. Owens*, 718 F. Supp. 665, 685 (W.D. Tenn. 1989). *See also Campbell v. McGruder*, 580 F.2d 521, 532 (D.C. Cir. 1978) ("the responsibilities of the jail increase as the

---

[5] The Sixth Circuit has held, in an unpublished disposition, that deprivation of a mattress for a two-week period did not violate the Eighth Amendment rights of a prisoner. *Jones v. Toombs*, 1996 WL 67750, * 1 (6th Cir. Feb.15, 1996).

period of the detainee's incarceration grows longer. Conditions that might be tolerable for ten days, might be unacceptable if imposed for a month or longer."); *Lareau v. Manson*, 651 F.2d 96, 105 (2d Cir. 1981) ("the length of the confinement cannot be ignored in assessing its constitutionality. Conditions unacceptable for weeks or months might be tolerable for a few days.").

Gynnya was without a mattress from approximately 6:33 a.m. until 3:44 p.m. [DE 1 at ¶ 34]. She was then provided a mattress at approximately 5:19 p.m. [DE 1 at ¶ 36]. She thus was not deprived of a mattress when she passed away from sudden cardiac event between 11:39 p.m. and 11:44 p.m. [DE 1 at ¶ 43]. The Intake Staff's removal of the mattress pad for a period of nine hours during the daytime does not amount to a prolonged exposure to unlivable or dangerous conditions, and thus it is not clear from precedent that "*every* reasonable official would have understood . . . *beyond debate*" that the Intake Staff's conduct in these circumstances constituted excessive force. *al-Kidd*, 563 U.S. at 741. Thus, even drawing all reasonable inferences in favor of McMillen, the removal of the mattress did not violate clearly established law. The Court will grant the Intake Staff's Motion for Summary Judgment on the excessive force claim.

### b. Program Supervisor Kimbler

McMillen alleges that Program Supervisor Kimbler violated the Fourth Amendment by depriving Gynnya of her right to be free from unreasonable seizure and punishment as a pretrial detainee. [DE 1 at ¶¶ 84–95]. In her response to Program Supervisor Kimbler's Motion to Dismiss and/or for Summary Judgment [DE 65], McMillen voluntarily dismisses that claim [DE 80 at 833]. Thus, Program Supervisor Kimbler's Motion for Summary Judgment on this claim is moot.

### c. Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady

Similarly, McMillen alleges that Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady violated Gynnya's Fourth Amendment right to be free from unreasonable seizure and punishment as a pretrial detainee. [DE 1 at ¶¶ 84–95]. McMillen voluntarily dismissed these claims in her response to a motion to dismiss. [DE 78 at 725]. Commissioner Hayter's, Deputy Commissioner Cook's, and Superintendent Grady's Motion for Summary Judgment [DE 128] on these claims is therefore moot.

### 2. Medical Needs (Count II)

#### a. Assistant Superintendent Price

McMillen alleges denial of medical care against Assistant Superintendent Price under 42 U.S.C. § 1983. [DE 1 at ¶¶ 96–112]. Assistant Superintendent Price responds by moving to dismiss "all claims against [him] under 42 U.S.C. § 1983." [DE 61 at 576]. That said, McMillen rightly notes that Assistant Superintendent Price's motion does not discuss the medical-needs claim. [DE 79 at 799–800]. Assistant Superintendent Price also does not address the medical-needs claim in his reply. [*See* DE 89]. Rule 56 requires a showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" by "citing to particular parts of materials in the record . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(a)–(c). Because Assistant Superintendent Price does not try to make such a showing, his motion is denied as to Count II.

#### b. Program Supervisor Kimbler, Counselor Mullins, and Newby

McMillen also alleges denial of medical care against Program Supervisor Kimbler, Counselor Mullins, and Newby. [DE 1 at ¶¶ 96–112]. Those Defendants respond that they are entitled to qualified immunity. [DE 63 at 612–14; DE 65 at 629–30; DE 123 at 1402–05].

First, the parties dispute the appropriate legal standard for McMillen's claims. These Defendants argue that the Court must consider whether they "acted with deliberate indifference to [Gynnya's] medical needs" under the Fourteenth Amendment. [DE 123 at 1403 (citing *Morabito v. Holmes*, 628 F. App'x 353, 358 (6th Cir. 2015))]. McMillen asserts that Defendants' conduct should be measured under the Fourth Amendment's "objective reasonableness" standard. [DE 141 at 2056 (citing *Aldini*, 609 F.3d at 860)].

The Sixth Circuit has applied the "deliberate indifference" standard in both the Eighth and Fourteenth Amendment contexts. *See Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (Eighth Amendment); *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) ("Pretrial detainees are analogously protected under the Due Process Clause of the Fourteenth Amendment." (citing *Bell*, 441 U.S. at 545)). And although *Aldini*, in the excessive-force context, held that the Fourth Amendment's reasonableness standard applies until a probable-cause hearing occurs when an individual is arrested without a warrant, 609 F.3d at 866, the Sixth Circuit has never explicitly drawn that line in the medical-needs context. Indeed, the Sixth Circuit has applied the Fourteenth Amendment's "deliberate-indifference" standard when pretrial detainees have brought medical-needs claims, even though the detainees were arrested without a warrant and had yet to have a probable-cause hearing. *See Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018); *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005).

In a recent unpublished opinion, the Sixth Circuit discussed the uncertainty in this area by noting that "[w]e have never squarely decided whether the Fourth Amendment's objective reasonableness standard can ever apply to a plaintiff's claims for inadequate medical treatment." *Esch v. Cty. of Kent*, 699 F. App'x 509, 514 (6th Cir. 2017) (citing *Boone v. Spurgess*, 385 F.3d

923, 934 (6th Cir. 2004)).  In *Esch*, the Sixth Circuit "conclude[d] that it [wa]s not necessary to decide whether the Fourth or the Fourteenth Amendment supplies the basis for Plaintiff's claims, because her claims fail under both the deliberate indifference and objective reasonableness standards." *Id.* at 515.  The court "therefore assume[d] *arguendo* that the Fourth Amendment's more forgiving objective reasonableness standard govern[ed] th[e] appeal, because 'behavior that does not rise to the level of a Fourth Amendment violation cannot offend the Fourteenth.'" *Id.* (quoting *Smith v. Erie Cty. Sheriff's Dep't*, 603 F. App'x 414, 418 (6th Cir. 2015)).

As in *Esch*, the claim here fails under either standard.  The Court will therefore apply the Fourth Amendment's more-forgiving standard in analyzing McMillen's claim.  In medical-needs cases,

> Four factors inform [the Court's] determination of whether an [official's] response to [a plaintiff's] medical needs was objectively unreasonable: (1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns. [*Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)].  [The plaintiff] must also show that the defendants' conduct caused the harm of which she complains.  *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) . . . . "[T]he severity of the medical condition under this standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendments.  Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." [*Rodriguez*, 509 F.3d at 403].

*Esch*, 699 F. App'x at 515 (quoting *Ortiz v. City of Chicago*, 656 F.3d 523, 530–31 (7th Cir. 2011) (second, third, fourth, and fifth alterations in original).  In performing this inquiry, the court "must review 'the totality of the circumstances, analyzing the facts from the perspective of a reasonable [official in the defendants' position], rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001)).

Here, all four factors favor Defendants. First, McMillen presents no facts suggesting that Counselor Mullins, Program Supervisor Kimbler, or Newby knew of Gynnya's heart condition, even though Defendants have repeatedly cited this lack of factual support. [*See* DE 63 at 614–15; DE 123 at 1404]. Second, McMillen has not shown that Gynnya was suffering from an objectively serious medical condition because she cannot show that Gynnya had an ailment "that ha[d] been diagnosed by a physician as mandating treatment." *Mattox v. Edelman*, 851 F.3d 583, 598 (6th Cir. 2017) (quoting *Blackmore*, 390 F.3d at 897). Indeed, McMillen's own expert has since clarified that Gynnya's heart condition was undiagnosed. [DE 146-1 at 2463–64]. Third, McMillen does not show that Gynnya requested any treatment for her unknown illness at Lincoln Village. Finally, McMillen makes no causal connection between Gynnya's illness and Defendants' conduct, and the undisputed facts in the record belie any such connection. Counselor Mullins and Program Supervisor Kimbler were not at Jefferson Village when Gynnya began to toss in her bed. [DE 123 at 1399–1400]. When Counselor Mullins was on-site, she performed all of her required bed checks. [DE 123-1 at 1413]. McMillen's medical expert has testified that before Gynnya's death, there would have been nothing to suggest cardiac arrest was likely. [DE 146-1 at 2464]. Newby, a control room operator, was on-site and responsible for monitoring 60–70 cameras within the facility. [DE 123 at 1399–1400]. She was not, however, responsible for monitoring cells, which was the responsibility of those required to conduct bed checks. [*Id.*]. Considered together, these factors establish that Defendants did not behave unreasonably.

For these reasons, McMillen fails to produce facts showing that a constitutional violation occurred. And because there has been no constitutional violation, the Court need not determine whether the purportedly violated right was clearly established. *Pearson*, 555 U.S. at 236. The Court therefore grants Defendants' motion for summary judgment on the medical-needs claim.

### c. Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady

McMillen alleges that Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady violated the Fourth and Fourteenth Amendments by depriving Gynnya medical care as a pretrial detainee. [DE 1 at ¶¶ 96–112]. McMillen voluntarily dismissed these claims in her response to a motion to dismiss. [DE 78 at 725]. Commissioner Hayter's, Deputy Commissioner Cook's, and Superintendent Grady's Motion for Summary Judgment [DE 128] on these claims is therefore moot.

### 3. Failure to Train and Supervise (Count III)

Next, McMillen alleges that Assistant Superintendent Price, Program Supervisor Kimbler, Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady violated the Fourth Amendment by failing to train and supervise their employees. [DE 1 at ¶¶ 113–20].[6] A supervisor may not be liable for the unconstitutional conduct of his subordinates under a theory of *respondeat superior*. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). For that reason, a supervisor is not liable unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009) (citations omitted); *see also Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) ("[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged

---

[6] Although McMillen styles the claim as one for failure to train and supervise, she does not specifically discuss failure to train. Rather, she asserts that Defendants failure to supervise the staff's behavior and enforce the required bed checks—presumably through ongoing enforcement and behavioral training related to the bed-check policy—was an unconstitutional violation. [*See* DE 1 at ¶¶ 113–20; DE 141 at 2060–62]. Even so, the standard for supervisory liability encompasses both supervision and training. *See Shehee*, 199 F.3d at 300.

the specific incident of misconduct or in some other way directly participated in it.").  As a result, the plaintiff "must prove that [the supervisor] did more than play a passive role in the alleged violations or show mere tacit approval of the goings on."  *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (citation omitted).  Rather, the plaintiff "must show that the supervisors somehow encouraged or condoned the actions of their inferiors."  *Id.* (citations omitted).

### a.  Assistant Superintendent Price

Assistant Superintendent Price moves for summary judgment on McMillen's § 1983 claim for failure to train and supervise.  [DE 61 at 576].  As with the medical-needs claim, Price's motion and reply do not discuss this claim.  [*See* DE 61; DE 89].  For the reasons outlined in Section II(B)(2)(a), Price has thus not met his burden under Rule 56, and his motion is denied as to Count III.

### b.  Program Supervisor Kimbler

Program Supervisor Kimbler moves for summary judgment on McMillen's claim for failure to train and supervise, arguing that McMillen has not shown that Program Supervisor Kimbler encouraged or directly participated in the allegedly unconstitutional conduct of failing to address Gynnya's medical needs.  [DE 65 at 630–31; DE 123 at 1405–06].

McMillen argues that Program Supervisor Kimbler's failure to ensure bed checks were performed amounts to an implicit authorization of the conduct.  [DE 141 at 2061].  The Sixth Circuit considered similar arguments in *Gregory*, in which the plaintiff argued that "supervisors who knowingly abdicate specific responsibilities to oversee subordinates can be held liable for their subordinates' unconstitutional acts . . . [because] such complete abdication of supervision tacitly acquiesced in, and predictably led to the constitutional violations in issue."  444 F.3d at 751–52.  The court rejected that argument and reiterated that a plaintiff must show that an

27

"execution of the supervisors' job function resulted in Plaintiff's injury." *Id.* at 752. And the Sixth

Circuit has consistently held that a failure to act does not support a claim for supervisory liability.

*See, e.g.*, *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016); *Bass v. Robinson*, 167

F.3d 1041, 1048 (6th Cir. 1999); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).

Because McMillen relies on Program Supervisor Kimbler's inaction in enforcing the required bed

checks, she has failed to make out a claim. The Court will therefore grant Kimbler's motion on

Count III.

### c. Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady

Similarly, Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady

move for summary judgment on McMillen's claim for failure to train and supervise, arguing that

McMillen has not shown that they encouraged or directly participated in the allegedly

unconstitutional conduct. [DE 128-1 at 1478–80].

McMillen argues that these three Defendants implicitly authorized improper conduct

because "[t]here are no fewer than ten separate written documents in the record dating back to

2013 which state that Lincoln Village was having a serious problem in ensuring youths were being

appropriately monitored to ensure their health and safety." [DE 140 at 1699 (citing [DE 140-2])].

Supervisor Holt and Supervisor Windham have testified that Lincoln Village employees were

instructed to do "catching up checks"—*i.e.*, not performing safety checks and falsely writing that

they were completed—and had done so since the beginning of their employment. [*Id.*; DE 140-

12 at 1902, 1909–10].

That said, McMillen does not assert that these three Defendants ever individually instructed

or otherwise actively condoned catching up checks. And McMillen has not refuted their testimony

that they never encouraged anyone to violate KYDJJ policy, skip checks on a youth, or falsify documents, or authorized, approved, or knowingly acquiesced in doing those things. [*See* DE 128-13 at 1606; DE 128-15 at 1624; DE 128-16 at 1633]. Thus, even if unnamed Lincoln Village employees instructed staff to do catching up checks, McMillen does not present facts suggesting that Commissioner Hayter, Deputy Commissioner Cook, or Superintendent Grady gave any such instruction. McMillen has therefore failed to show that these three Defendants "did more than play a passive role in the alleged violations," *Gregory*, 444 F.3d at 751, and the Motion for Summary Judgment must be granted on Count III.

### 4. State-Law Claims

#### a. Negligence Claims (Counts IV–VI)

Next, McMillen brings various state-law claims against Gaudern, Kevin Johnson, Assistant Superintendent Price, Rivers, Commissioner Hayter, Deputy Commissioner Cook, Superintendent Grady, Program Supervisor Kimbler, Counselor Mullins, and Newby, including negligence, negligence per se, and negligent hiring, training, supervision, and retention. [DE 1 at ¶¶ 121–43]. Those Defendants move for summary judgment based on qualified immunity under Kentucky law.

"Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 521–22 (Ky. 2001). But "an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, *i.e.*, one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act

arising from fixed and designated facts." *Id.* at 522. Thus, qualified immunity depends "on the function performed" and whether the official acted in "good faith." *Id.* at 521.

### i. Negligence (Count IV)

#### 1. Gaudern, Kevin Johnson, and Rivers, and Assistant Superintendent Price

McMillen alleges that the Intake Staff was negligent in forcibly restraining Gynnya during the intake search. [DE 1 at ¶¶ 121–29]. The Intake Staff argue that "SOP 702 gives no discretion as to whether staff should search juvenile on intake. Rather, policy commands, without exception, that the staff must conduct a frisk search of juveniles on intake." [DE 61-1 at 585]. But McMillen does not question whether the Intake Staff were authorized to conduct an intake search. Instead, McMillen asserts that the Intake Staff behaved negligently in conducting that intake search by not following SOP 702's mandate that "[a]ny juvenile cleared to be admitted and is combative, aggressive[,] or non-compliant will be secured in an Intake Holding Room until control is regained and the intake process can be safely completed." [DE 79 at 808; DE 61-4 at 590].

The Supreme Court of Kentucky has consistently instructed that when a government official must merely execute a specific act arising from a fixed and designated set of facts, the act is ministerial. *See, e.g.*, *Stratton v. Commonwealth*, 182 S.W.3d 516, 521 (Ky. 2006); *Jones v. Lathram*, 150 S.W.3d 50, 53 (Ky. 2004); *Yanero*, 65 S.W.3d at 522; *Collins v. Commonwealth of Ky. Nat. Res. & Envtl. Prot. Cabinet*, 10 S.W.3d 122, 126 (Ky. 1999). SOP 702 establishes specific acts to be taken from a fixed set of facts—*i.e.*, managing a non-compliant detainee during the intake search. The Intake Staff have not argued that they had discretion to ignore SOP 702's mandates or that they did not act negligently by doing so. Because a reasonable jury could find

that the Intake Staff behaved negligently by disregarding SOP 702, the Intake Staff's motion is denied at to Count IV.

### 2. Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady

McMillen's asserts that Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady were negligent in preventing Gynnya's "foreseeable injury." [DE 1 at ¶¶ 121–29]. McMillen later voluntarily dismissed these claims against Commissioner Hayter and Deputy Commissioner Cook. [DE 78 at 728]. Commissioner Hayter's, Deputy Commissioner Cook's, and Superintendent Grady's Motion for Summary Judgment [DE 128] on these claims is therefore denied as moot for Commissioner Hayter and Deputy Commissioner Cook.

Facility Superintendent Grady argues that she is entitled to qualified immunity. [DE 128-1 at 1480–81]. An employee establishes a *prima facie* defense by showing the acts as alleged in the complaint were discretionary, made in good faith (*i.e.*, not made in bad faith), and performed within the scope of the employee's authority. *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 476 (Ky. 2006), *as corrected* (Sept. 26, 2006). "Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act [was in bad faith]." *Yanero*, 65 S.W.3d at 523.

McMillen does not dispute that Superintendent Grady was acting within the scope of her public employment or that her actions were in good faith. [*See* DE 1 at ¶ 83]. Thus, the only determination left for the *prima facie* defense is whether the negligence claim against Superintendent Grady involves discretionary or ministerial acts. McMillen argues that KYDJJ 717 required Superintendent Grady to authorize Gynnya's placement in isolation for more than

four hours, and thus her function was ministerial.  [DE 140 at 1701].  Superintendent Grady argues that her acts were discretionary and that, even if they were ministerial, her alleged negligence did not cause McMillen's injury.  [DE 128-1 at 1481–82].

As in initial matter, McMillen is incorrect about the mandates of KYDJJ 717.  The policy states that "[w]hen a youth is confined to a room for more than 24 hours, authorization shall be obtained from the Facility Superintendent."  [DE 148-22 at 2818].  More importantly, it would be virtually impossible for Superintendent Grady to violate this policy.  The policy required staff to request authorization from Superintendent Grady or Assistant Superintendent Price to authorize continued isolation.  [*Id.*].  If the staff did not seek authorization, that is a policy violation by the staff, not the Superintendent.  And if the staff did ask Superintendent Grady for authorization, the policy affords her discretion to either authorize or not authorize continued isolation.  Thus, either way, Superintendent Grady complied with the policy.

Because KYDJJ 717 afforded Superintendent Grady discretion to either authorize or deny continued isolation, her function was not ministerial.  *Sloas*, 201 S.W.3d at 476.  And, as noted, McMillen does not dispute that she was acting within the scope of her public employment or that she acted in good faith.  [*See* DE 1 at ¶ 83].  McMillen's negligence claim against Superintendent Grady is therefore dismissed.

### 3.  Program Supervisor Kimbler, Counselor Mullins, and Newby

Similarly, McMillen asserts that Program Supervisor Kimbler, Counselor Mullins, and Newby were negligent in preventing Gynnya's "foreseeable injury."  [DE 1 at ¶¶ 121–29].  Those Defendants respond that they are entitled to qualified immunity "because the factual content from the discovery [sic] demonstrates that their conduct was discretionary and not ministerial."  [DE

123 at 1406]. They also argue that McMillen has failed to show causation between Defendants' acts and Gynnya's injury. [*Id.* at 1406–08].

To state a cause of action based on negligence, a plaintiff must establish "a causal connection between the breach of the duty and an injury suffered by the plaintiff." *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436–37 (Ky. Ct. App. 2001).

> The causal connection or proximate cause component traditionally was composed of two elements: cause-in-fact and legal or consequential causation. Cause-in-fact involves the factual chain of events leading to the injury; whereas, consequential causation concerns the concepts of foreseeability and the public policy consideration on limiting the scope of responsibility for damages. In Kentucky, the cause-in-fact component has been redefined as a "substantial factor" element as expressed in Restatement (Second) of Torts § 431. The scope of duty also includes a foreseeability component involving whether the risk of injury was reasonably foreseeable.

*Id.* As discussed in Section II(B)(2)(b), McMillen makes no causal connection between Gynnya's illness and Defendants' conduct, and the undisputed facts in the record belie any such connection. Counselor Mullins and Program Supervisor Kimbler were not at Jefferson Village when Gynnya began to toss in her bed. [DE 123 at 1399–1400]. When Counselor Mullins was on-site, she performed all of her required bed checks. [DE 123-1 at 1413]. McMillen thus makes no causal connection between Counselor Mullins's behavior and Gynnya's death.

McMillen argues that Program Supervisor Kimbler's failure to enforce the bed-check policy caused or contributed to Gynnya's death. [DE 141 at 2063]. But Supervisor Windham *did* ostensibly conduct a bed check at 11:39 p.m.,[7] and he has testified that Gynnya did not appear to

---

[7] Supervisor Windham may have been negligent when he conducted the bed check by not ensuring that Gynnya was breathing. [*See* DE 1-27 (discussing the requirement that Lincoln Village staff ensure detainees are breathing during bed checks)]. If so, it was Supervisor Windham's negligence, not Program Supervisor Kimbler's failure to ensure that bed checks were conducted every fifteen minutes, that was the proximate cause of Gynnya's death. *See Patton v. Bickford*, 529 S.W.3d 717, 731 (Ky. 2016); *Howard v. Spradlin*, 562 S.W.3d 281, 287–88 (Ky. App. 2018).

be in medical distress at that time. [DE 146-3 at 2564]. Gynnya died between 11:39 p.m. and 11:44 p.m. from LQT2 based on a disease-causing mutation. [DE 1 at ¶ 43; DE 1-18 at 114]. McMillen's medical expert, Dr. Schwartz, testified that before Gynnya's time of death, there would have been no indication that the cardiac arrest or death was likely to occur. [DE 146-1 at 2464]. Dr. Schwartz also suggested that Gynnya may have survived had she received "prompt resuscitative intervention" between the time Gynnya began exhibiting symptoms around 11:39 p.m. and when she died within the next five minutes. [DE 1-18 at 114–15]. But employees were required to conduct bed checks every fifteen minutes, so the next bed check would have been at 11:54 p.m.—approximately ten minutes after Gynnya died (at the latest). [DE 1 at ¶ 22; DE 1-4 at 53]. Thus, even if Program Supervisor Kimbler were negligent in not strictly enforcing bed-check requirements, McMillen has not established that this behavior was a substantial factor in Gynnya's death.

Newby was responsible for monitoring 60–70 cameras within the facility. [DE 123 at 1399–1400]. She was not, however, responsible for monitoring cells. [*Id.*; *see also* DE 123-17 (stipulating that "[a]t no time is the control operator to do checks on youth in Intake")]. McMillen has thus not established any causal connection between Newby's conduct and Gynnya's death.

For these reasons, the Court will grant these Defendants' motion on Count IV.

### ii. *Negligence Per Se (Count V)*

McMillen alleges negligence per se against Gaudern, Kevin Johnson, Assistant Superintendent Price, Rivers, Commissioner Hayter, Deputy Commissioner Cook, Superintendent Grady, Program Supervisor Kimbler, Counselor Mullins, and Newby. [DE 1 at ¶¶ 130–36]. Those Defendants now move for summary judgment. [DE 61; DE 65; DE 123; DE 128]. McMillen voluntarily dismisses this claim against Commissioner Hayter and Deputy Commissioner Cook.

[DE 78 at 728].  Commissioner Hayter's, Deputy Commissioner Cook's, and Superintendent Grady's Motion for Summary Judgment [DE 128] on this claim is thus moot for Commissioner Hayter and Deputy Commissioner Cook.

Negligence per se "is merely a negligence claim with a statutory standard of care substituted for the common law standard of care."  *Young v. Carran*, 289 S.W.3d 586, 588–89 (Ky. App. 2008) (citations omitted).  McMillen has cited no statute violated by the relevant Defendants, relying instead on violations of Lincoln Village's internal operating procedures.  But an organization's internal operating procedures cannot create per se liability.  *See Flechsig v. United States*, 991 F.2d 300, 304 (6th Cir. 1993).  The Court will therefore grant Defendants' motions on McMillen's negligence–per se claims.

*iii.  Negligent Hiring, Training, Supervision, and Retention (Count VI)*

1.  Assistant Superintendent Price

Assistant Superintendent Price moves for summary judgment on McMillen's claim for negligent hiring, training, supervision, and retention asserting he is entitled to qualified immunity under Kentucky law.  [DE 61-1 at 584–85].  But as with the medical-needs and failure-to-supervise claims, Assistant Superintendent Price's motion and reply do not discuss this claim.  [*See* DE 61; DE 89].  For the reasons outlined in Section II(B)(2)(a), Assistant Superintendent Price has thus not met his burden under Rule 56, and his motion is denied as to Count VI.

2.  Commissioner Hayter, Deputy Commissioner Cook, Superintendent Grady, and Program Supervisor Kimbler

McMillen asserts claims for negligent hiring, training, supervision, and retention against Commissioner Hayter, Deputy Commissioner Cook, Superintendent Grady, and Program

Supervisor Kimbler. [DE 1 at ¶¶ 137–43]. Those Defendants move for summary judgment on qualified-immunity grounds. [DE 123 at 1408–10; DE 128-1 at 1483–84].

"Kentucky law recognizes that an employer can be held liable for the negligent supervision of its employees." *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003) (citing *Smith v. Isaacs*, 777 S.W.2d 912 (Ky. 1989)); *see also McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 291 (Ky. App. 2009). Yet the training, supervision, and management of employees is a discretionary function "involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Sloas*, 201 S.W.3d at 477. Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady were management employees exercising discretion in seeking and implementing appropriate management techniques. [DE 1 at ¶¶ 8–10; DE 148 at 2699–2700]. Even if those techniques are ripe for criticism, McMillen does not deny that Commissioner Hayter, Deputy Commissioner Cook, and Superintendent Grady acted in good faith. [DE 128-1 at 1481–83]. Because Commissioner Hayter's, Deputy Commissioner Cook's, and Superintendent Grady's functions were discretionary, they acted within the scope of their authority, and acted in good faith, they are entitled to qualified immunity on the claims for negligent hiring, training, and supervision. *Yanero*, 65 S.W.3d at 521–22.

As to negligent hiring and retention, decisions of whether to terminate or suspend a corrections officer for a policy violation is "clearly a discretionary act." *Jefferson Cty. Fiscal Court v. Peerce*, 132 S.W.3d 824, 833 (Ky. 2004), *as modified* (Feb. 23, 2004). Similarly, the hiring process is discretionary as long as the person being hired is not known to be incompetent. *Yanero*, 65 S.W.3d at 528 (citing *Whitt v. Reed*, 239 S.W.2d 489, 491 (Ky. 1951)). Deputy Commissioner Cook, Superintendent Grady, and Program Supervisor Kimbler were never the appointing authority for the KYDJJ and thus never had authority to hire, fire, or discipline

employees. [*See* DE 65-1 at 637; DE 128-15 at 1624; DE 128-16 at 1634]. Commissioner Hayter was appointing authority for the KYDJJ, but McMillen does not deny that Commissioner Hayter conducted his duties in good faith or argue that he knowingly hired incompetent employees. [DE 128-1 at 1483–84]. Because Commissioner Hayter's function was discretionary, he acted within the scope of his authority, and acted in good faith, he is entitled to qualified immunity. *Yanero*, 65 S.W.3d at 521–22. Thus, Commissioner Hayter's, Deputy Commissioner Cook's, Facility Superintendent Grady's, and Program Supervisor Kimbler's motions are granted as to Count VI.

### b.  Assault (Count VII) and Battery (Count VIII)

McMillen asserts that Gaudern, Kevin Johnson, Assistant Superintendent Price, and Rivers committed assault when they "unlawfully directed force towards Gynnya under such circumstances as to create a well-founded fear of immediate peril" during the intake process. [DE 1 at ¶¶ 144–48]. Similarly, McMillen asserts that Gaudern, Kevin Johnson, and Rivers committed battery when they forcefully restrained Gynnya during the intake process. [*Id.* at ¶¶ 149–53]. Defendants now move for summary judgment on the respective claims. [DE 61 at 584].

Kentucky law authorizes the use of physical force upon another person when an authorized official of a correctional institution "believes that the force used is necessary for the purpose of enforcing the lawful rules of the institution[,] . . . the degree of force used is not forbidden by any statute governing the administration of the institution[,] . . . and . . . if deadly force is used, its use is otherwise justifiable under this code." Ky. Rev. Stat. § 503.110. Gynnya was being held in a secure juvenile detention facility. The rules of the facility, codified in SOP 702, required Gynnya

to remove her hoodie jacket during intake. [DE 61-4 at 590].[8] For the reasons outlined in Section II(B)(1)(a), Defendants' specific use of force in effectuating the search was both lawful and an objectively reasonable method to enforce the rules of the institution and potentially prevent contraband from entering the facility. For these reasons, Gaudern, Kevin Johnson, Assistant Superintendent Price, and Rivers are entitled to summary judgment on Count VII, and Gaudern, Kevin Johnson, and Rivers are entitled to summary judgment on Count VIII.

### c. False Imprisonment (Count IX)

McMillen brings false imprisonment claims against Assistant Superintendent Price, Program Supervisor Kimbler, and Superintendent Grady, alleging they "deprived Gynnya of her liberty when they restrained her in an isolation cell wrongfully, improperly, and without a claim of reasonable justification." [DE 1 at ¶ 155]. Those Defendants separately move for summary judgment. [DE 61 at 576; DE 123 at 1410–11; DE 128-1 at 1484–85].

"To constitute the injury of false imprisonment, there are two points requisite: (1) The detention of the person, and (2) the unlawfulness of such detention." *Great Atl. & Pac. Tea Co. v. Smith*, 136 S.W.2d 759, 767 (Ky. App. 1939) (citation omitted). These prerequisites must be "strictly enforced." *Smith v. Stokes*, 54 S.W.3d 565, 566 (Ky. App. 2001). In Kentucky, if a detainee is detained pursuant to judicial process, there is no false imprisonment. *Fultz v. Whittaker*, 261 F. Supp. 2d 767, 783 (W.D. Ky. 2003); *Evans v. Sir Pizza of Ky., Inc.*, No. CIV.A.09-86-KSF, 2010 WL 2365331, at *5 (E.D. Ky. June 11, 2010), *aff'd*, 476 F. App'x 605 (6th Cir. 2012); *Stokes*, 54 S.W.3d at 567.

---

[8] Although the SOP reflects that "[a]ny juvenile cleared to be admitted and is combative, aggressive[,] or non-compliant will be secured in an Intake Holding Room until control is regained and the intake process can be safely completed," it does not forbid the use of force if a detainee refuses to comply. [DE 61 at 584].

The Shelby County District Court ordered Gynnya's detention after her arrest. [DE 1 at ¶ 28]. McMillen asserts that Gynnya was still falsely imprisoned because she was held in an isolation cell in violation of internal procedures. [DE 80 at 844–45]. But the undisputed facts show that Gynnya asked to remain in isolation during her time at Lincoln Village. [DE 148-23 at 2819 (noting that "Gynnya requested to stay in the isolation cell area and did not want to be placed with the rest of the female population")]. False imprisonment does not apply when the person consents to confinement. *See Banks v. Fritsch*, 39 S.W.3d 474, 479 (Ky. App. 2001) ("Kentucky cases define false imprisonment as being any deprivation of the liberty of one person by another or detention for however short a time without such person's consent and against his will, whether done by actual violence, threats or otherwise."). Gynnya was thus lawfully confined under a court order and consented to the conditions of her confinement. Summary judgment is therefore granted on Count IX.

### 5. Motions to Seal

Next, Program Supervisor Kimbler, Counselor Mullins, and Newby move for leave to file videos under seal [DE 126] pursuant to the Court's January 31, 2018 Order. [*See* DE 95]. Similarly, Deputy Commissioner Cook, Superintendent Grady, and Commissioner Hayter move for leave to file videos under seal. [DE 129]. The parties seek to file these videos under seal "because unrestricted use of the video footage could create security and safety risks to the current staff of the facility and to the public." [DE 126 at 1456; DE 129 at 1638]. For the same reasons outlined in its January 31, 2018 Order, the Court is persuaded that the unrestricted production, dissemination, and use of the Lincoln Village video footage creates security and safety risks to the current staff of that facility and to the public. [*See* DE 95 at 1049]. The Court will therefore grant Defendants' motions.

### 6. **Motions to Exclude Expert Testimony**

Finally, several Defendants move to exclude or limit expert testimony by Dr. David Roush. [DE 115; DE 125; DE 131]. Defendants argue that Dr. Roush is unreliable because his report was preliminary and admittedly based on insufficient data, and McMillen has thus violated the Court's Order [DE 57] requiring that complete Rule 26(a)(2) disclosures be submitted by November 1, 2017. [DE 115 at 1326; DE 125 at 1452].

Rule 26 instructs that a party using an expert witness must disclose a report containing "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). "The purpose of the rule is to eliminate 'unfair surprise to the opposing party.'" *City of Owensboro v. Ky. Utilities Co.*, No. 4:04-CV-87-M, 2008 WL 4642262, at *3 (W.D. Ky. Oct. 14, 2008) (quoting *Muldrow ex rel. Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007)). "Section 26(a)(2)(B) does not limit an expert's testimony simply to reading his report." *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006). Instead, "[t]he rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Id.* To comply with the requirements of Rule 26, a report must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

McMillen hired Dr. Roush to provide expert testimony, and Dr. Roush was thus required to provide a written report. *Id.* During a September 18, 2017 telephonic conference, the parties agreed that McMillen would file the final report by November 1, 2017, before the deposition of Dr. Peter Schwarz set for November 16, 2017. [DE 57]. Dr. Schwarz's deposition was time critical because he is not a resident of the United States and had limited availability. [*Id.*]. On November 1, 2017, McMillen submitted Dr. Roush's report, which states: "My preliminary opinions in this letter are limited by prior experience, which suggests that multiple important documents sources that [sic] have yet to be identified, produced, and reviewed. I have already started a list of these possible documents, along with pertinent questions regarding the incident." [DE 68-3 at 671]. McMillen did not supplement Dr. Roush's report before the time for disclosing additional experts expired on August 31, 2018.

Ten months after McMillen filed Dr. Roush's report, and after the close of discovery, Defendants filed the first motion to exclude Dr. Roush's testimony. [DE 115]. Defendants argue that the language above proves the report does not comply with Rule 26 because it "does not contain 'a complete statement of all opinions the witness will express and the basis and reasons for them' nor can it contain 'the facts or data considered by the witness in forming them' since it clearly states additional information is required to issue a final opinion." [DE 115 at 1327 (citing Fed. R. Civ. P. 26(a)(2)(B))]. Defendants argue that because Dr. Roush never filed a final report, they have been "deprived of an opportunity to engage experts to rebut opinion testimony offered by Dr. Roush." [*Id.* at 1327–28]. They also argue that Dr. Roush is unreliable because the report offers inadmissible legal conclusions. [DE 125 at 1452–54; DE 131 at 1650–52].

While Defendants are correct that Dr. Roush noted the need for additional information to draw additional conclusions, he reviewed an extensive record when forming his preliminary report.

[*See* DE 115-1]. Dr. Roush explicitly anticipated that further information might not be forthcoming, however, stating, "*if or when* more information becomes available, I reserve the right to modify these opinions following a review of new documents." [*Id.* (emphasis added)]. This suggests that absent additional information, Dr. Roush intended for his conclusions to be final. Defendants' decision not to raise this issue until ten months later and after the close of discovery suggests that their concerns about the report did not affect discovery or cause undue prejudice. *See Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000); *Abdulla v. Klosinski*, 898 F. Supp. 2d 1348, 1359 (S.D. Ga. 2012), *aff'd*, 523 F. App'x 580 (11th Cir. 2013); *Richman v. Sheahan*, 415 F. Supp. 2d 929, 940 (N.D. Ill. 2006).

As for the reliability of Dr. Roush's report, expert witnesses may not testify to legal conclusions or to the applicability or interpretation of a particular statute or regulation. *See Torres v. Cty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985). "The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury. This 'invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law.'" *Id.* (quoting *F.A.A. v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983)). Thus, if Dr. Roush testifies, he may not discuss any legal conclusions outlined in his preliminary report. Any such conclusions will be excluded at trial.

Considering this background, it is unclear whether and in what context this issue will arise at trial. That said, Dr. Roush's testimony must be reasonably limited to the report filed in November 2017 and the information relied on in that report, and the Court expects the parties not to offer new conclusions or opinions. *See Jackson v. E-Z-GO Div. of Textron, Inc.*, No. 3:12-CV-00154-TBR, 2018 WL 3575924, at *15 (W.D. Ky. July 25, 2018), *opinion after grant of reconsideration*, No. 3:12-CV-00154-TBR, 2018 WL 3721385 (W.D. Ky. Aug. 3, 2018). For

these reasons, Defendants' motions are granted in part and denied in part, in conformity with the discussion above.

## CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED** as follows:

(1)     Motion to Dismiss on Behalf of Defendants Bob Hayter, Mark Cook, and Michelle Grady [DE 59] is **GRANTED IN PART** and **DENIED IN PART AS MOOT**;

(2)     Motion for Summary Judgment by Laura Gaudern, Kevin Johnson, Michael Price, and Lisa Rivers [DE 61] is **GRANTED IN PART** and **DENIED IN PART**;

(3)     Motion to Dismiss on Behalf of Defendants Newby and Mullins [DE 63] is **DENIED AS MOOT**;

(4)     Motion to Dismiss and/or for Summary Judgment on Behalf of Defendant Kimbler [DE 65] is **GRANTED IN PART** and **DENIED IN PART AS MOOT**;

(5)     Motion for Partial Summary Judgment or to Hold Action in Abeyance [DE 114] is **DENIED AS MOOT**;

(6)     Defendants' Motion in Limine to Exclude or Limit Expert Testimony by David Roush, Ph.D. [DE 115] is **GRANTED IN PART** and **DENIED IN PART**;

(7)     Motion for Summary Judgment on Behalf of Defendants Newby, Mullins, and Kimbler [DE 123] is **GRANTED IN PART** and **DENIED IN PART AS MOOT**;

(8)     Motion to Strike Expert Witness David W. Roush [DE 125] is **GRANTED IN PART** and **DENIED IN PART**;

(9)     Motion for Leave to File Videos Under Seal [DE 126] is **GRANTED**;

(10)    Motion for Summary Judgment by Defendants Bob Hayter, Mark Cook, and

Michelle Grady [DE 128] is **GRANTED IN PART** and **DENIED IN PART AS MOOT**;

(11)    Motion for Leave to File Videos Under Seal [DE 129] is **GRANTED**; and

(12)    Motion to Strike Expert Witness David W. Roush [DE 131] is **GRANTED IN
PART** and **DENIED IN PART**.

Rebecca Grady Jennings, District Judge
United States District Court

August 26, 2019

Copes to:    Counsel of record