UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

MICHELLE MCMILLEN, Individually and                                    Plaintiff
as Administratrix of the ESTATE OF
GYNNYA MCMILLEN

v.                                              Civil Action No. 3:16-cv-00558-RGJ-CHL

REGINALD WINDHAM, ET AL.                                              Defendants

* * * * *

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michelle McMillen, individually and as administratrix of Gynnya McMillen's

estate, sues Defendants Youth Worker Supervisor, Reginald Windham ("Supervisor Windham");

Youth Worker Supervisor, Victor Holt ("Supervisor Holt"); Commissioner, Bob Hayter

("Commissioner Hayter"); Deputy Commissioner Program Director, Mark Cook ("Deputy

Commissioner Cook"); Facility Superintendent, Michelle Grady ("Superintendent Grady");

Assistant Superintendent, Michael Price ("Assistant Superintendent Price"); Youth Services

Program Supervisor, Brent Kimbler ("Program Supervisor Kimbler"); Counselor, Vicki Mullins

("Counselor Mullins"); Youth Worker, Lashae Newby ("Newby"); Youth Worker, Chris Johnson

("Chris Johnson"); Youth Worker, Kevin Johnson ("Kevin Johnson"); Youth Worker, Lisa Rivers

("Rivers"); and Youth Worker, Loretta Gaudern ("Gaudern") for alleged violations of the United

States Constitution and Kentucky law.  [DE 1].

Defendants Laura Gaudern, Kevin Johnson, Michael Price, and Lisa Rivers move the Court

to alter or amend its August 26, 2019 Memorandum Opinion & Order [DE 168], and Defendants

Supervisor Windham, Supervisor Holt, and Chris Johnson move for summary judgment under Rule 56.  [DE 171; DE 172; DE 185].[1]  Briefing is complete[2], and the motions are ripe.

For the reasons below, the Court **DENIES** the Motion to Alter or Amend [DE 168] and **GRANTS IN PART AND DENIES IN PART** the Motion for Summary Judgment by Supervisor Windham and Supervisor Holt [DE 171; DE 172] and **GRANTS IN PART AND DENIES IN PART** the Motion for Summary Judgment by Chris Johnson  [DE 185].

## I.    <u>BACKGROUND</u>

On Sunday, January 10, 2016, the Shelbyville Police Department responded to a domestic dispute between sixteen-year-old Gynnya McMillen ("Gynnya") and her mother, Michelle McMillen ("McMillen"), at their home in Shelbyville, Kentucky.  [DE 1 ¶ 27].  After the police arrested Gynnya without a warrant, a Shelby County District Court Judge ordered Gynnya's detention at the Lincoln Village Regional Juvenile Detention Center ("Lincoln Village"), a Kentucky Department of Juvenile Justice ("KYDJJ") facility, until her scheduled court date on Monday morning.  [*Id.* ¶ 28].

When Gynnya arrived at Lincoln Village, she went through an intake process that included a search for contraband.  [*Id.* ¶¶ 88–89].  Gynnya refused to remove her hoodie jacket, telling Chris Johnson, Kevin Johnson, Gaudern, and Rivers to "get out of [her] face."  [DE 61-5 at 596]. Supervisor Holt received telephone authorization from Assistant Superintendent Price to restrain

---

[1] Rather than draft Motions for Summary Judgment in their own words, Supervisor Windham's and Supervisor Holt's counsel seemingly copied and pasted the Court's Memorandum Opinion & Order [DE 167] into a Word document, making minor changes and adjustments to it to convert it from an order to a motion.  Although counsel has the right to decide how to advocate for his clients, the Court will note that these briefs do not help the Court make its ruling.

[2] McMillen did not respond to Chris Johnson's Motion for Summary Judgment although the time for doing so has elapsed.

Gynnya.  [DE 79 at 800–01].  After hanging up the phone, Supervisor Holt "yell[ed] and point[ed] at Gynnya and then repeatedly slap[ped] the intake desk."  [*Id.*].  Chris Johnson restrained Gynnya's arms, after which Gaudern frisked Gynnya.  [*Id.*; DE 61-1 at 580].  Gynnya "became combative and began kicking her legs," striking Chris Johnson in the midsection.  [*Id.*].  Chris Johnson and Kevin Johnson applied more pressure and forced Gynnya to the ground.  [DE 79-1 at 811].  Gynnya told them she was in pain [DE 79-2 at 812], and an internal investigation of the incident later revealed that Gynnya suffered injuries to her thigh and leg area [DE 79-4 at 817].  When Gynnya said she was in pain, Kevin Johnson replied that "none of this would have happened if [you] had complied with the search."  [DE 79-2 at 812].  Defendants completed the search when Gynnya stopped resisting.  [DE 61-1 at 580].

Defendants then placed Gynnya in a cell ("Room 423").  [DE 1 ¶ 31].  Gaudern removed the mattress pad from Gynnya's bed, leaving Gynnya alone with a metal bed frame and without a mattress pad or blanket.  [DE 1 ¶ 31; DE 1-11, Ex. J; DE 79 at 801].

As part of Lincoln Village's rules and regulations, Lincoln Village employees needed to conduct bed checks at set intervals, including at least every fifteen minutes during sleep hours.  [DE 1 ¶ 22; DE 1-4 at 53].  During the bed checks, employees were to verify that the resident was safe and secure in the room, and then document the check on the Unit Room Observation Sheet.  [*Id.*].  In 2013, Assistant Superintendent Price held a meeting on the importance of bed checks, including the need to make sure the youth was breathing.  [*Id.* ¶ 82; DE 1-27].  Assistant Superintendent Price stated, "he would not stand behind anyone who failed to do their jobs" and that staff conducting the bed checks "should stop at the door of each resident and make sure the youth is breathing."  [DE 1-27].

Defendants placed Gynnya in Room 423 at 6:22 a.m. and removed her later that day at 3:44 p.m. [DE 1 ¶ 28].  During that time, the Lincoln Village staff failed to perform and falsified records for twenty-three required bed checks of Room 423.  [*Id.* ¶ 37].  From the time Gynnya returned to Room 423 at 5:19 p.m. until 11:39 p.m., the Lincoln Village staff failed to perform and falsified records for another twelve required bed checks of Room 423.  [*Id.* ¶ 38].  And from 10:35 p.m. to 11:39 p.m., Supervisor Windham personally failed to perform four required bed checks. [*Id.* ¶ 39].

At 11:39 p.m., Supervisor Windham heard coughing coming from Room 423.  [*Id.* ¶ 40]. He went "to check on [Gynnya] to make sure she had not thrown up and was choking or something like that."  [*Id.*]   In conducting the check, Supervisor Windham looked through the narrow slit in the door for about 18 seconds, during which he saw Gynnya turn onto her right side and her left leg hanging off the bed at the knee.  [*Id.* ¶ 42–43].  Supervisor Windham then returned to his desk. [*Id.* ¶ 43].  He falsified twenty-four more bed checks between the time he checked on Gynnya at 11:39 p.m. and the time Supervisor Holt and Youth Worker Chris Johnson discovered Gynnya the next morning.  [*Id.* ¶ 49].

At about 9:55 a.m. the next morning, Supervisor Holt and Youth Worker Chris Johnson entered Room 423 and tried unsuccessfully for several minutes to awaken Gynnya for transport to Shelby County District Court.  [*Id.* ¶¶ 70–71].  Nurse Jennifer Swiney then arrived to assess Gynnya, who was still unresponsive.  [*Id.* ¶ 72].  Swiney and Nurse, Paula Maupin, checked Gynnya's pulse.  Swiney called 911 dispatch and said Gynnya was cold, stiff, and without respirations or vital signs. [*Id.* ¶¶ 72–73].  Maupin, with Swiney's assistance, performed CPR on Gynnya.  [*Id.* ¶ 74].  Emergency personnel arrived about ten minutes later and assessed her

4

condition.  [*Id.* ¶ 75].  She was dead.  Hardin County Coroner William H. Lee, Jr. arrived and, with emergency personnel, placed Gynnya in a body bag and removed her from the cell.  [*Id.* ¶ 76].

According to McMillen's medical expert, Dr. Schwartz, Gynnya died between 11:39 p.m. and 11:44 p.m. from long QT syndrome type 2 ("LQT2") based on a disease-causing mutation. [DE 1 ¶ 43; DE 1-18 at 114].  Dr. Schwartz testified that before Gynnya's death, there would have been nothing to indicate that cardiac arrest or death was likely to occur.  [DE 146-1 at 2464]. LQT2 patients tend to die at rest or nighttime due to a cardiac rhythm called ventricular fibrillation, which produces a significant drop in blood pressure.  [DE 1-18 at 114].  As blood pressure decreases and the oxygen perfusion of the brain decreases progressively, gasping occurs, which is often interpreted as coughing when heard from a distance.  [*Id.*].  Dr. Schwartz suggested that Gynnya may have survived had she received "prompt resuscitative intervention" between the time she began exhibiting symptoms around 11:39 p.m. and when she died within the next five minutes. [*Id.* at 114–15].

The Justice Cabinet's Internal Investigations Branch investigated the circumstances surrounding Gynnya's death.  In a Memorandum of Concern, investigator Ed Jewell concluded that the "office not only substantiated that six employees at [Lincoln Village] did not provide appropriate supervision, this office also identified other issues that in this investigator's opinion contributed to what can only be described as a breakdown in staff supervision of" Gynnya.  [DE 1-8 at 77].  Among other things, Jewell concluded that there was a systematic falsification of room observation forms, including that the "staff missed and falsified sixty-five bed checks" around the time of Gynnya's death.  [*Id.* at 79; DE 1 ¶¶ 36–39].  Jewell also concluded that "[t]his systematic breakdown led to staff possibly not noticing [Gynnya] in a medically stressed state" and, at the

very least, the "staff would have noticed [Gynnya] was unresponsive earlier than when she was discovered." [*Id.*].

McMillen, individually and as administratrix of Gynnya's estate, sued Supervisor Windham, Supervisor Holt, Commissioner Hayter, Deputy Commissioner Cook, Superintendent Grady, Assistant Superintendent Price, Program Supervisor Kimbler, Counselor Mullins, Newby, Chris Johnson, Kevin Johnson, Rivers, Gaudern, and the Commonwealth of Kentucky for alleged violations of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983 and various Kentucky laws. [DE 1].

## II.  DISCUSSION

### I.  Motion to Alter or Amend

Defendants Gaudern, Johnson, Price, and Rivers move the Court to alter or amend its Memorandum Opinion & Order [DE 167] to grant them summary judgment on Count IV (Negligence) of the Complaint [DE 1]. They argue that an organization's internal standard operating procedures (SOP) cannot form the basis of a negligence claim because it does not create a standard of care. [DE 168 at 2940]. They assert that the standard of care should not be standard operating procedures but should be "such care as a reasonably prudent youth worker in a secure juvenile facility would exercise when admitting a juvenile to the facility." [*Id.* at 2941]. Applying their interpretation of the law to the facts, they contend that "searching Gynnya McMillen rather than placing her in an intake holding cell without searching her is entirely consistent with their duty to Ms. McMillen . . . No reasonable jury, properly instructed on the standard of care could find that [they] were negligent for frisking Gynnya McMillen prior to placing her in an intake cell." [*Id.*].

The Court disagrees.  Under Kentucky law, "a governmental employee can [generally] be held personally liable for negligently failing to perform or negligently performing a ministerial act," such as following an SOP.  *Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky. 2014).  And the Sixth Circuit "has recognized that consideration of a standard operating procedure is appropriate in considering the scope of duty flowing from the defendant to a plaintiff in a negligence action." *Keir v. United States*, 853 F.2d 398, 413 (6th Cir. 1988).  This Court has found that the SOP that these Defendants allegedly failed to follow was ministerial, not discretionary.  [DE 167 at 2925-2926] ("The Intake Staff have not argued that they had discretion to ignore SOP 702's mandates or that they did not act negligently in doing so.  Because a reasonable jury could find that the Intake Staff behaved negligently by disregarding SOP 702, the Intake Staff's motion is denied").  The Court therefore **DENIES** their Motion to Alter or Amend [DE 168].

## II.     Motions for Summary Judgment

### A.   Standard

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion."  *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252.

## B.  Discussion

### 1.    Excessive Force (Count I)

#### a.  Supervisor Holt and Chris Johnson[3]

McMillen asserts that Supervisor Holt and Chris Johnson violated the Fourth Amendment by depriving Gynnya of her right to be free from unreasonable search, seizure, and punishment as a pretrial detainee.  [DE 1 ¶¶ 84–95].  Supervisor Holt and Chris Johnson assert that qualified immunity protects them from McMillen's § 1983 claims.  [DE 172-1 at 2996; DE 185-1 at 3113].

---

[3] McMillen brought an excessive force claim against Supervisor Windham.  Supervisor Windham however was not at work when Supervisor Holt and Chris Johnson allegedly used excessive force.  [DE 171-1 at 2957].  Because he was not working, Supervisor Windham could not have participated in the excessive use of force.  In her Response, McMillen does not contest this argument.  In fact, McMillen does not even argue that he used excessive force.  For these reasons, the Court grants his Motion as to this claim.

"Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).  It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  When advanced by a defendant, qualified immunity is a threshold question of law appropriately determined on a motion for summary judgment.  *Harlow v. Fitzgerald*, 457 U.S. 800 (1983). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The plaintiff bears the ultimate burden of proof in establishing that a defendant has no right to qualified immunity.  *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).  That said, in moving for summary judgment based on qualified immunity, a defendant must first show "facts to suggest that he acted within the scope of his discretionary authority during the incident in question." *Id.*  The burden then shifts to the plaintiff to show "that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct." *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017).  If "undisputed facts show that the defendant's conduct did indeed violate clearly established rights[,]" or "if there is a factual dispute . . . involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights[,]" a court must deny summary judgment.

9

*Gardenhire*, 205 F.3d at 311 (quoting *Poe v. Haydon*, 853 F.2d 418, 425–26 (6th Cir. 1988) (citations omitted)).

The Supreme Court requires a two-pronged approach when resolving questions of qualified immunity, although courts may decide the order in which to address these prongs "in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. First, the Court must decide whether a plaintiff has presented facts sufficient to find a violation of a constitutional right. *Id.* at 232. Second, the Court must decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.* Thus, qualified immunity applies unless the official's conduct violates a clearly established constitutional right. *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Supervisor Holt and Chris Johnson argue that no violation occurred because they had a right to conduct an intake search and the force used in effectuating that search was objectively reasonable. [DE 172-1 at 2996; DE 185-1 at 3115]. McMillen asserts that Supervisor Holt behaved unreasonably in Gynnya's intake and that clearly established law put him on notice that he was violating Gynnya's Fourth Amendment rights. [DE 186 at 3130-3132].

*i. Constitutional Violation*

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Generally, "[t]he Fourth Amendment's prohibition against unreasonable seizures bars excessive force against free citizens . . . while the Eighth Amendment's ban on cruel and unusual punishment bars excessive force against convicted persons," and the Fourteenth Amendment bars excessive force when neither category applies. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (citations omitted).

10

When authorities arrest an individual without a warrant, the Fourth Amendment's reasonableness standard applies until a probable-cause hearing occurs, after which the Fourteenth Amendment's more-stringent "shocks-the-conscience" standard applies. *Aldini v. Johnson*, 609 F.3d 858, 866 (6th Cir. 2010) (citing *Bell v. Wolfish*, 441 U.S. 520, 536 (1979)).  This is because "the probable-cause hearing is a judicial proceeding that affects the 'legal status' of the arrestee, constitutionally authorizing his detention throughout the proceedings against him, just as a guilty verdict affects his 'legal status' by authorizing his detention for the duration of his sentence." *Id.* "Additionally, establishing the line between Fourth and Fourteenth Amendment protection at the probable-cause hearing creates an incentive to hold the hearing as soon as possible, which is certainly beneficial to the judicial process." *Id.* at 866–67 (citing *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 58 (1991)).

McMillen identifies the Fourth Amendment's prohibition against unreasonable search and seizure as the allegedly infringed right.  [DE 1 ¶ 86].  Law enforcement arrested Gynnya without a warrant and ordered her detained until her court date.  [*Id.* ¶¶ 27-28].  Because no probable-cause hearing occurred, the Court analyzes these facts under the Fourth Amendment's reasonableness standard.

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell*, 441 U.S. at 559 (citations omitted).  In the context of a detainee search, courts must "examine the scope, manner, and location of the search—as well as the justification for initiating it—in order to assess the degree to which it invaded the [detainee's] right to privacy." *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 574 (6th Cir. 2013) (citing *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 322 (2012)).  It must "next evaluate the need for the search, giving due deference to the correctional officer's exercise

11

of her discretionary functions.  Finally, [it] determine[s] whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion." *Id.*

The Supreme Court has conveyed that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547.  "Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies." *Florence*, 566 U.S. at 322.  This is particularly true during the initial intake of a detainee.  Indeed, the Supreme Court has consistently found invasive searches intended to keep contraband from entering detention facilities objectively reasonable.  *See, e.g.*, *id.* at 334– 35 (rectal searches permissible for all detainees, even those detained for minor offenses); *Bell*, 441 U.S. at 520 (cavity searches).

The search here, which included only a frisk, was limited in scope and justified by the legitimate interest of keeping contraband out of the detention center.  Thus, Supervisor Holt and Chris Johnson did not violate Gynnya's constitutional rights by performing an intake search.

McMillen also disputes how Supervisor Holt carried out the search, including the force used.  [DE 186 at 3130-3131].  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396.  "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 395).

12

Lincoln Village Standard Operating Procedure 702 ("SOP 702") establishes the appropriate procedures for the intake process.  [*See* DE 61-4 at 590].  It states that "[t]he resident will be required to remove any outer coat or cap and place it on the floor next to him/her," and that "[a]ny juvenile cleared to be admitted and is combative, aggressive[,] or non-compliant will be secured in an Intake Holding Room until control is regained and the intake process can be safely completed."  [*Id.*].

Other than as noted above, McMillen does not question the constitutionality of the intake procedures, which Supervisor Holt and Chris Johnson violated by not securing Gynnya in a holding room until she complied.  Rather, McMillen questions the constitutionality of Supervisor Holt's and Chris Johnson's actions in violating those procedures.  *See Stoudemire*, 705 F.3d at 574.

When considering the acts of officials sued in their individual capacities, an official's violation of internal operating procedures does not, without more, amount to a constitutional violation.  *Id; See Davis v. Scherer*, 468 U.S. 183, 194 ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision"); *Tanberg v. Sholtis*, 401 F.3d 1151, 1160 (10th Cir. 2005)  ("Even if [the official] violated the SOPs, this violation would not create a violation of a clearly established constitutional right ex nihilo").

McMillen argues that "established case law – as well as DJJ and Lincoln Village policies – clearly establishes that Supervisor Holt was on notice that his and his subordinates actions were unconstitutional . . . Gynnya was not 'aggressive' as required prior to using 'nonpunitive' force under DJJ 713."  [DE 186 at 3132].  The Court disagrees.  Supervisor Holt's and Chris Johnson's response to Gynnya's noncompliance (i.e., refusal to remove her hoodie jacket) was an objectively

reasonable method to maintain order and carry out the intake search.  Their decision to restrain Gynnya served the interests of maintaining institutional safety, particularly given Gynnya's belligerent behavior.  *See Griffin v. Hardrick*, 604 F.3d 949, 954–55 (6th Cir. 2010)  (no excessive force when officials performed a "leg-sweep maneuver" to subdue a non-compliant inmate); *Erby v. Ray*, 47 F. App'x 744, 745 (6th Cir. 2002) (upholding a cell extraction and the use of gas after an inmate refused to remove his hand from the food slot in his cell door); *Boyd v. Halley*, No. 3:16-CV-00697, 2017 WL 3453292, at *4 (M.D. Tenn. Aug. 11, 2017), *report and recommendation adopted*, No. 3:16-CV-00697, 2017 WL 4150460 (M.D. Tenn. Sept. 19, 2017).  As a result, a reasonable jury could not find that their use of force was excessive, and the use of force therefore did not violate Gynnya's Fourth Amendment rights.

The removal of the mattress pad from Gynnya's cell is another matter, however.  "The Sixth Circuit has long adhered to the view that the Fourth Amendment prohibits excessive force under certain pre-trial circumstances." *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 528 (6th Cir. 2018) (citing *McDowell*, 863 F.2d at 1306).  The Fourth Amendment's prohibition on excessive force controls not only "the permissible *duration* of 'warrantless, post-arrest, pre-arraignment custody,'" but also "the *condition* of such custody." *Aldini*, 609 F.3d at 866 (quoting *Pierce v. Multnomah Cty.*, 76 F.3d 1032, 1043 (9th Cir. 1996)).

While the Fourth Amendment's reasonableness standard guides this case because there had been no probable-cause hearing, the Supreme Court's Fourteenth Amendment jurisprudence on pretrial detention is instructive. *See Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985) (analogizing "the eighth amendment rights of prisoners . . . to those of detainees under the fourteenth amendment, to avoid the anomaly of extending greater constitutional protection to a convict than to one awaiting trial" (citations omitted)).  The Constitution protects those in state

custody from punishment because a "person lawfully committed to pretrial detention has not been adjudged guilty of any crime.  He has had only a judicial determination of probable cause as a prerequisite to the extended restraint of his liberty following arrest."  *Bell*, 441 U.S. 520, 536 (internal quotation marks, citation, and alterations omitted).  Thus, the Court has said that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."  *Graham*, 490 U.S. at 395 n.10 (citing *Bell*, 441 U.S. at 535–539).  To determine whether an action is a permissible restraint or an impermissible punitive measure, courts consider whether there is "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015).

McMillen asserts that Defendants removed the mattress pad from Gynnya's cell to punish Gynnya for her failure to cooperate during the intake search.[4]  [*See* DE 1 ¶¶ 31, 87; DE 1-11, Ex. J; DE 186 at 3131 ("The fact that Defendant Gaudern removed the mattress pad from isolation cell 423 immediately prior to Gynnya's confinement . . .  would certainly cause a reasonable youth worker to know his or her conduct went too far.  Simply put, supervisor Victor Holt and his subordinates intended to punish Gynnya the morning of January 10, 2016. The 'gratuitous violence' inflicted on Gynnya was objectively unreasonable")].  Supervisor Holt disagrees, averring: 1) "[b]ased upon my training and experience as a Youth Worker and Kentucky

---

[4] While Gaudern removed the mattress pad before Gynnya's confinement, government officials "can be held liable for failure to protect a person from the use of excessive force." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).  "Generally speaking, a[n official] who fails to act to prevent the use of excessive force may be held liable when (1) the offic[ial] observed or had reason to know that excessive force would be or was being used, and (2) the offic[ial] had both the opportunity and the means to prevent the harm from occurring." *Id.* (citation omitted); *see also Durham v. Nu'Man*, 97 F.3d 862, 866–68 (6th Cir. 1996); *McHenry v. Chadwick*, 896 F.2d 184, 188 (6th Cir. 1990).  Gaudern removed the pad before placing Gynnya in the cell, and thus Supervisor Holt and Chris Johnson had reason to know that it was removed.  They also could have prevented the harm by returning the mattress pad when they realized it had been removed.

15

Department of Juvenile Justice, mattresses are removed from cells for various reasons, such as combative behavior, cleaning, prevent destruction and/or prevent self-harm"; and 2) "[o]n January 10, 2016, the mattress belonging in the cell of Gyunya [sic] McMillen was removed because of her combative behavior to prevent her from using it as a shield or destroying it and causing damage."  [DE 171-3 at 2984].

Although Supervisor Holt has offered evidence of a "countervailing governmental interest at stake" to counterbalance the intrusion into Gynnya's Fourth Amendment right to be free from unreasonable custodial conditions, there still is a genuine issue of material fact about the reason the bed was removed.  *Graham*, 490 U.S. at 396; *Aldini*, 609 F.3d at 866.

For these reasons, Supervisor Holt and Chris Johnson did not violate the Constitution during the intake search, but a jury could find that Gynnna's Fourth Amendment rights were violated when the  mattress pad was removed from her cell.

### ii.    *Clearly Established Right*

Even if an official's behavior violates the Constitution, however, qualified immunity applies unless the official's conduct violates a clearly established right.  *Pearson*, 555 U.S. at 232. The official's conduct violates clearly established right "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear'" that every "reasonable official would have understood that what he is doing violates that right."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Creighton*, 483 U.S. at 640).  A case directly on point is not required.  *Id*.  Instead, existing precedent must place the constitutional question beyond debate.  *Id*.  "In other words,

existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citation omitted).[5]

In examining "existing precedent," the Court looks "first to decisions of the Supreme Court," then to Sixth Circuit cases and "decisions of other courts within the circuit, and then to decisions of other Courts of Appeal." *Andrews v. Hickman Cty.*, 700 F.3d 845, 853 (6th Cir. 2012). Although the conduct at issue in those cases need not be identical, the legal precedent "must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion" that the conduct is unlawful. *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012).

In evaluating whether a right is clearly established, courts cannot "define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742, 131 S. Ct. 2074. Instead, "[t]he 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). The officer's conduct must be unlawful not in the abstract but "in the situation he confronted." *Id.* Of course, there can be the rare "obvious case," where the unlawfulness of the officer's conduct is clear enough even though existing precedent does not address similar circumstances. *Id.*, citing *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam ). "But 'a body of relevant case law' is usually necessary to 'clearly establish' the answer' with respect to probable cause." *Id.* Thus, "[w]hether a defendant is

---

[5] The Supreme Court has recognized "that officials can still be on notice that their conduct violates established law even in novel factual circumstances" and has "rejected a requirement that previous cases be 'fundamentally similar'" to the facts in a case to render qualified immunity inapplicable. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States v. Lanier*, 520 U.S. 259, 263 (1997)). As noted, however, the Court has more recently held that plaintiffs must identify existing precedent that places the legal question "beyond debate" to "every" reasonable officer, *al-Kidd*, 563 U.S. at 741, and has since appeared committed to that more-stringent standard. *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam).

protected by qualified immunity turns not on whether the defendant was on notice that his actions satisfied the elements of a particular cause of action, but instead on whether the defendant was on notice that his actions violated the laws of the United States." *Jackson v. City of Cleveland*, 920 F.3d 340, 372 (6th Cir. 2019); *see also Miller v. Maddox*, 866 F.3d 386, 395 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 2622 (2018); *Spurlock*, 167 F.3d at 1005–06 (finding that a right was clearly established even though that right was previously analyzed under the Fourteenth Amendment but was now properly analyzed under the Fourth Amendment). Here, although McMillen asserts violations of the Fourth Amendment, Supervisor Holt and Chris Johnson will not be entitled to qualified immunity if precedent clearly establishes that they were on notice of the unlawfulness of their behavior under United States law, even if not the Fourth Amendment specifically.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Although the Eighth Amendment does not apply to pretrial detainees, these detainees have a right under the Fourteenth Amendment's Due Process Clause analogous to a prisoner's Eighth Amendment right to be free from cruel and unusual punishment. *See Bell,* 441 U.S. at 535 & n. 16; *Roberts,* 773 F.2d at 723.  Pretrial detainees have a right to "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." *Ruiz-Bueno v. Scott*, 639 F. App'x 354, 362 (6th Cir. 2016), citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Supreme Court has instructed that "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention . . . the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell*, 441 U.S. at 535.

> Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense, however. Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

*Id.* at 537.  To determine whether conditions are punitive,  "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."  *Id.* (citing *Flemming v. Nestor*, 363 U.S. 603, 613 (1960)). On the other hand, "if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 538.

The test for evaluating alleged violations of the right to humane conditions of confinement has both an objective and a subjective component.  *Farmer*, 511 U.S. at 834. The objective component requires showing a "sufficiently serious" deprivation that caused the denial of the "minimal civilized measure of life's necessities," while the subjective component requires showing a sufficiently culpable state of mind—one of deliberate indifference.  *Id.* at 834 and 842. If the deprivation stems from an omission or failure to prevent harm, there must be evidence that the detainee was "incarcerated under conditions posing a substantial risk of serious harm." *Id.*

Here, as discussed above, although the removal of the mattress was incident to some other legitimate governmental purpose, a reasonable jury could still find removal of the mattress was

punishment.  But McMillen does not point to precedent analogous to the removal of Gynnya's mattress pad that would show a violation of clearly established law.  Because the burden is on McMillen to show that the Supervisor Holt's and Chris Johnson's behavior violated a clearly established right, this alone warrants grant of summary judgment.  *See Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017), *cert. denied sub nom. Shafer v. Padilla*, 138 S. Ct. 2582 (2018). Nor has McMillen put forth evidence establishing that removal of the mattress contributed to Gynnya's heart problem or posed any other substantial risk of serious harm to Gynnya's health.

The Sixth Circuit has held in an unpublished opinion that confinement to a cell without a mattress for a period of seven days, despite falling below minimal standards of decency, did not violate clearly established law because the evidence did not show that such conditions posed a substantial risk of serious harm.  *Ruiz-Bueno v. Scott*, 639 F. App'x 354, 362 (6th Cir. 2016).[6] Other federal courts have held that short-term deprivations of a mattress pass constitutional muster. *See Harris v. Connolly*, No. 5:14-cv-128, 2016 WL 676468, at *4 (W.D.N.C. Feb. 18, 2016) (collecting cases). That said, "frequent or long term deprivations" may be constitutionally problematic.  *Gilland v. Owens*, 718 F. Supp. 665, 685 (W.D. Tenn. 1989). *See also Campbell v. McGruder*, 580 F.2d 521, 532 (D.C. Cir. 1978) ("the responsibilities of the jail increase as the period of the detainee's incarceration grows longer. Conditions that might be tolerable for ten days, might be unacceptable if imposed for a month or longer."); *Lareau v. Manson*, 651 F.2d 96, 105

---

[6] The Sixth Circuit has held, in an unpublished disposition, that deprivation of a mattress for a two-week period did not violate the Eighth Amendment rights of a prisoner. *Jones v. Toombs*, 1996 WL 67750, * 1 (6th Cir. Feb.15, 1996).

(2d Cir. 1981) ("the length of the confinement cannot be ignored in assessing its constitutionality. Conditions unacceptable for weeks or months might be tolerable for a few days.").

Gynnya was without a mattress from approximately 6:33 a.m. until 3:44 p.m. [DE 1 ¶ 34]. She was then provided a mattress at approximately 5:19 p.m. [DE 1 ¶ 36]. She thus was not deprived of a mattress when she passed away from sudden cardiac event between 11:39 p.m. and 11:44 p.m. [DE 1 ¶ 43]. The removal of the mattress pad for a period of nine hours during the daytime does not amount to a prolonged exposure to unlivable or dangerous conditions, and thus it is not clear from precedent that "*every* reasonable official would have understood . . . *beyond debate*" that their conduct in these circumstances constituted excessive force. *al-Kidd*, 563 U.S. at 741. Thus, even drawing all reasonable inferences in favor of McMillen, the removal of the mattress did not violate clearly established law. The Court will grant Supervisor Holt's Motion and Chris Johnson's Motion on the excessive force claim.

### 2. Medical Needs (Count II)

McMillen alleges denial of medical care against Supervisor Windham and Supervisor Holt. [DE 1 ¶¶ 96–112]. They respond that they are entitled to qualified immunity. [DE 171-1 at 2968].

First, the parties dispute the appropriate legal standard for McMillen's claims. These Defendants argue that "[w]hether the appropriate legal standard to apply in this case is deliberate indifference under the Fourteenth Amendment, or objective reasonableness under the Fourth Amendment, the plaintiffs [sic] claim must fail." [DE 171-1 at 2968]. McMillen asserts that the Court should measure Defendants' conduct under the Fourth Amendment's "objective reasonableness" standard. [DE 186 at 3132].

The Sixth Circuit has applied the "deliberate indifference" standard in both the Eighth and Fourteenth Amendment contexts. *See Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th

Cir. 2009) (Eighth Amendment); *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) ("Pretrial detainees are analogously protected under the Due Process Clause of the Fourteenth Amendment." (citing *Bell*, 441 U.S. at 545)).  And although *Aldini*, in the excessive-force context, held that the Fourth Amendment's reasonableness standard applies until a probable-cause hearing occurs when an individual is arrested without a warrant, 609 F.3d at 866, the Sixth Circuit has never explicitly drawn that line in the medical-needs context.  Indeed, the Sixth Circuit has applied the Fourteenth Amendment's "deliberate-indifference" standard when pretrial detainees have brought medical-needs claims, even though the detainees were arrested without a warrant and had yet to have a probable-cause hearing.  *See Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018); *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005).

In a recent unpublished opinion, the Sixth Circuit discussed the uncertainty in this area by noting that "[w]e have never squarely decided whether the Fourth Amendment's objective reasonableness standard can ever apply to a plaintiff's claims for inadequate medical treatment." *Esch v. Cty. of Kent*, 699 F. App'x 509, 514 (6th Cir. 2017) (citing *Boone v. Spurgess*, 385 F.3d 923, 934 (6th Cir. 2004)).  In *Esch*, the Sixth Circuit "conclude[d] that it [wa]s not necessary to decide whether the Fourth or the Fourteenth Amendment supplies the basis for Plaintiff's claims, because her claims fail under both the deliberate indifference and objective reasonableness standards." *Id.* at 515.  The court "therefore assume[d] *arguendo* that the Fourth Amendment's more forgiving objective reasonableness standard govern[ed] th[e] appeal, because 'behavior that does not rise to the level of a Fourth Amendment violation cannot offend the Fourteenth.'" *Id.* (quoting *Smith v. Erie Cty. Sheriff's Dep't*, 603 F. App'x 414, 418 (6th Cir. 2015)).

As in *Esch*, the claim here fails under either standard.  The Court will therefore apply the Fourth Amendment's more-forgiving standard in analyzing McMillen's claim.  In medical-needs cases,

> Four factors inform [the Court's] determination of whether an [official's] response to [a plaintiff's] medical needs was objectively unreasonable: (1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns. [*Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)].  [The plaintiff] must also show that the defendants' conduct caused the harm of which she complains.  *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) . . . .  "[T]he severity of the medical condition under this standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendments.  Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment."  [*Rodriguez*, 509 F.3d at 403].

(quoting *Ortiz v. City of Chicago*, 656 F.3d 523, 530–31 (7th Cir. 2011) (second, third, fourth, and fifth alterations in original).  In performing this inquiry, the Court "must review 'the totality of the circumstances, analyzing the facts from the perspective of a reasonable [official in the defendants' position], rather than with the 20/20 vision of hindsight.'"  *Id.* (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001)).  Here, McMillen presents no facts suggesting that Defendants  knew of Gynnya's heart condition.[7]  McMillen has also not shown that Gynnya was

---

[7] McMillen asserts that "Defendant Windham [had] notice of Gynnya's need for medical attention as he was able to hear her 'cough' and suspected she may be vomiting while Defendant Windham was sitting some twenty feet away from her isolation cell listening to music."  [DE 186 at 3133].  The Court disagrees: it was not "objectively unreasonable" for Supervisor Windham, after checking on Gynnna in her cell and seeing her move, to believe that she was not in "acute physical distress."  *Esch*, 699 F. App'x at 516; *see Martinson v. Leason*, 22 F. Supp. 3d 952, 964 (D. Minn. 2014) ("[A]ssuming *arguendo* he did, in fact, report diarrhea and a bloody cough on top of cold symptoms, it is questionable whether these additional symptoms would elevate his maladies into an objectively serious medical need"); *see also Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010)  ("Vomiting, in and of itself, is not an uncommon result of being mildly ill, and, absent other circumstances (e.g., vomiting continuously for a long period of time, having blood in one's vomit, or the like), does not amount to an objectively serious medical condition").

suffering from an objectively serious medical condition because she cannot show that Gynnya had an ailment "that ha[d] been diagnosed by a physician as mandating treatment." *Mattox v. Edelman*, 851 F.3d 583, 598 (6th Cir. 2017) (quoting *Blackmore*, 390 F.3d at 897). Indeed, McMillen's own expert has since clarified that Gynnya's heart condition was undiagnosed. [DE 146-1 at 2463–64]. Nor has McMillen shown that Gynnya requested any treatment for her unknown illness at Lincoln Village. Finally, even assuming McMillen can show a causal connection between Supervisor Windham's conduct and Gynnya's illness, McMillen has not satisfied the other factors and thus has not shown that the Defendants' conduct was objectively unreasonable. *See Florek v. Village of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011) (failure to provide more aggressive medical care not unreasonable where "the medical need did not appear to be great"); *Legg v. Pappas*, 383 Fed. App'x 547, 551 (7th Cir. 2010) (failure to provide medical care not unreasonable where plaintiff "was not in serious medical need at the time" he was arrested); *Henriquez v. City of Bell*, No. CV 14-196-GW(SSX), 2015 WL 13357606, at *7 (C.D. Cal. Apr. 16, 2015) ("In the absence of evidence that would indicate to an [ordinary jailor] that Jose had a serious medical condition . . . it was objectively reasonable for Gallegos to simply monitor Jose at regular intervals and continue the booking process until Jose manifested obvious symptoms that he was in need of medical care").

For these reasons, McMillen fails to produce facts showing that a constitutional violation occurred. And because there has been no constitutional violation, the Court need not determine whether the purportedly violated right was clearly established. *Pearson*, 555 U.S. at 236. The Court therefore grants Defendants' Motions on the medical-needs claim.

### 3.  Failure to Train and Supervise (Count III)

Next, McMillen alleges that Supervisor Windham and Supervisor Holt violated the Fourth Amendment by failing to train and supervise their employees.  [DE 1 ¶¶ 113–20; DE 186 at 3137 ("It was Defendants Holt and Windham's job duty to ensure they and their subordinates performed bed checks.  Yet, on 64 separate occasions they and their subordinates failed to actually check on Gynnya to ensure her health and safety"].[8]  Supervisor Windham and Supervisor Holt disagree, arguing that McMillen has failed to show a causal connection between their failure to conduct bed checks and Gynnya's death.  [DE 172-1 at 3006].

A supervisor may not be liable for the unconstitutional conduct of his subordinates under a theory of *respondeat superior*.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  For that reason, a supervisor is not liable unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009) (citations omitted); *see also Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) ("[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it.").  As a result, the plaintiff "must prove that [the supervisor] did more than play a passive role in the alleged violations or show mere tacit approval of the goings on."  *Gregory v. City of*

---

[8] Although McMillen styles the claim as one for failure to train and supervise, she does not specifically discuss failure to train.  Rather, she asserts that Defendants failure to supervise the staff's behavior and enforce the required bed checks—presumably through ongoing enforcement and behavioral training related to the bed-check policy—was an unconstitutional violation.  [*See* DE 1 ¶¶ 113–20].  Even so, the standard for supervisory liability encompasses both supervision and training.  *See Shehee*, 199 F.3d at 300.

*Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (citation omitted).  Rather, the plaintiff "must show that the supervisors somehow encouraged or condoned the actions of their inferiors." *Id.* (citations omitted).

Supervisor Windham falsified the bed checks just before and during Gynnya's death. [DE 1 ¶¶ 39–42].  His actions thus constitute evidence that he directly participated in the specific misconduct—the falsified bed checks on Gynnya.  *Everson*, 556 F.3d 495.  His actions were also, according to McMillen's expert, a cause of Gynnya's death.  *See Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)  ("To succeed on a failure to train or supervise claim, the plaintiff must prove the [the inadequate training or supervision] . . . was closely related to or actually caused the injury"); [*Id.* ¶ 43 ("[A] prompt resuscitative intervention and emergency call in all likelihood would have saved Gynnya's life.")].  Thus, a jury could reasonably find that his actions were a cause of Gynnya's death.  Thus, the Court denies Supervisor Windham's Motion on this claim.

Supervisor Holt, however, is in a different position.  Although the record shows that Supervisor Holt directly participated in the specific incident of misconduct in question, the falsified bed checks on Gynnya while at Lincoln Village, this claim fails on causation: the record shows that he only falsified bed checks on Gynnya *after* she was already dead.  *See Ellis*, 455 F.3d at 700 (6th Cir. 2006); [DE 1 ¶¶ 60, 63–64, 68–69].  Moreover, although McMillen argues that Supervisor Holt "at a minimum, implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of [his] subordinates," the Sixth Circuit has consistently held that a failure to act does not support a claim for supervisory liability.  [DE 186 at 3136]; *See, e.g.*, *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016); *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th

Cir. 1999); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).  The Court, therefore, grants Supervisor Holt's Motion on this claim.

### 4.  State-Law Claims

#### a.  Negligence Claims (Counts IV–VI)

Next, McMillen brings various state-law claims against Chris Johnson, Supervisor Windham, and Supervisor Holt. [DE 1 ¶¶ 121–43].  They move for summary judgment based on qualified immunity under Kentucky law.

"Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 521–22 (Ky. 2001).  But "an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, *i.e.*, one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* at 522.  Thus, qualified immunity depends "on the function performed" and whether the official acted in "good faith." *Id.* at 521.

#### i.  Negligence (Count IV)

##### 1.  Supervisor Holt and Chris Johnson

McMillen alleges that the Defendants were negligent in forcibly restraining Gynnya during the intake search.  [DE 1 ¶¶ 121–29].  McMillen asserts that they "negligently used force on Gynnya on the morning of January 10, 2016" and the "the excessive force inflicted on Gynnya was the result of a failure to follow prescribed rules in place at Lincoln Village." [DE 186 at 3139].

The Supreme Court of Kentucky has consistently instructed that when a government official must merely execute a specific act arising from a fixed and designated set of facts, the act is ministerial.  *See, e.g.*, *Stratton v. Commonwealth*, 182 S.W.3d 516, 521 (Ky. 2006); *Jones v. Lathram*, 150 S.W.3d 50, 53 (Ky. 2004); *Yanero*, 65 S.W.3d at 522; *Collins v. Commonwealth of Ky. Nat. Res. & Envtl. Prot. Cabinet*, 10 S.W.3d 122, 126 (Ky. 1999).  SOP 702 establishes specific acts to be taken from a fixed set of facts—*i.e.*, managing a non-compliant detainee during the intake search.  Under SOP 702, if a detainee is non-compliant, she is to be placed in an "Intake Holding Room until control is regained and the intake process can be safely completed."  [DE 64-1 at 590].  Contrary to Supervisor Holt's assertion, a non-compliant detainee cannot be frisked until after she has been placed in an "Intake Holding Room" and the staff has regained control of the situation.  [DE 171-1 at 2973].  The Defendants claim Gynnya was non-compliant but, instead of placing her in an "Intake Holding Room," they frisked her.  Because a reasonable jury could find that the they behaved negligently by disregarding SOP 702, Supervisor Holt's and Chris Johnson's Motion is denied at to Count IV.

## 2.  Supervisor Windham

McMillen's asserts Supervisor Windham was negligent in preventing Gynnya's "foreseeable injury" by failing to "enter [her] cell to assess and resuscitate her."  [DE 1 ¶¶ 121–29].  Supervisor Windham argues that his conduct in falsifying the bed checks on Gynnya involved discretionary functions, not ministerial ones.  [DE 171-1 at 2977–79].  In *Marson v. Thomason*, the Kentucky Supreme Court addressed the distinction between ministerial and discretionary acts:

> The distinction between discretionary acts and mandatory acts is essentially the difference between making higher-level decisions and giving orders to effectuate those decisions, and simply following orders. Or, as we have stated, 'Promulgation of rules is a discretionary function; enforcement of those rules is a ministerial function.' *Williams v. Kentucky Dept. of Educ.*, 113 S.W.3d 145, 150 (Ky. 2003).

> *Thus, a ministerial act is a direct and mandatory act, and if it is properly performed*
> *there simply is no tort. But if such an act is omitted, or performed negligently, then*
> *that governmental employee has no immunity, and can be sued individually for his*
> *failure to act, or negligence in acting that causes harm.*

438 S.W.3d 292, 297 (Ky. 2014) (emphasis added).

Supervisor Windham claims that he had discretion in "[s]upervising a teen committed to the custody of the DJJ for criminal conduct" and that this function should not be parsed into separate acts in determining whether they were discretionary or ministerial.  [DE 171-1 at 2977–79].  That said, in *Marson*, the Kentucky Supreme Court found that while school officials were ultimately tasked with "look[ing] out for the students' safety," a discretionary function, that broader responsibility still included ministerial tasks, including pulling out the school bleachers in the morning.  *Marson*, 438 S.W.3d at 299–300.  The *Marson* court determined that pulling out the bleachers was a task assigned to a specific person and performed every day, and thus was "ministerial in nature to the person charged with that job."  *Id.* at 298.

Like pulling out the bleachers in *Marson*, the bed checks at Lincoln Village were assigned to specific individuals on duty.  However, bed checks were to be conducted not just daily, but at least every 15 minutes.  [DE 186 at 3120–21].  And though Supervisor Windham asserts that McMillen is incorrect in asserting that the bed checks' purpose was to determine whether the residents were breathing [DE 171-1 at 2977], that is exactly their purpose:

> Policy Number DJJ 110: "Bed checks in residential programs at least in fifteen (15) minute intervals during sleep hours including, at least hourly, a more thorough check to ensure that youth are breathing normally and are in no apparent medical distress."  [DE 186 at 3120 (citing DJJ SOP Policy 110)].

Furthermore, Supervisor Windham testified that, although he was listening to music at his desk, he still "heard Gynnya cough and suspected she may be vomiting."  [DE 186 at 3140 (citing

Deposition of Reginald Windham)].  His supervisors testified that "if Windham suspected Gynnya had vomited, as he did, then Windham was required to get a verbal response from Gynnya and open her door to assess her."  [*Id.* at 3141 (citing Depositions of Michelle Grady and Brent Kimbler)].  Windham himself acknowledged that "if he had done his bed checks and went into the cell to do the wellness check, he may have detected her condition early enough to have gotten her some medical attention."  [DE 1 at 17 (citing Exhibit N, Statement by Reginald Windham)].

Applying Kentucky law, the performance of bed checks at Lincoln Village was a ministerial act.  *Marson*, 438 S.W.3d at 297.  Likewise, just because Supervisor Windham had "some discretion with respect to the means or method to be employed," that did not transform the routine performance of bed checks into a discretionary act.  *Id.* Therefore, Supervisor Windham does not have qualified immunity for this claim.  Since a reasonable jury could find that Windham acted negligently in failing to properly perform bed checks on Gynnya, including the bed check he performed at the time of her death, and could find that this negligence was a proximate cause of Gynnya's death, the Court will deny Supervisor Windham's Motion on this count.

### ii.  Negligence Per Se (Count V)

McMillen alleges negligence per se against Chris Johnson, Supervisor Windham, and Supervisor Holt.  [DE 1 ¶¶ 130–36].  Those Defendants now move for summary judgment.  [DE 171; DE 172; DE 185].

Negligence per se "is merely a negligence claim with a statutory standard of care substituted for the common law standard of care."  *Young v. Carran*, 289 S.W.3d 586, 588–89 (Ky. App. 2008) (citations omitted).  McMillen has cited no statute violated by the relevant Defendants, relying instead on violations of Lincoln Village's internal operating procedures.  But an organization's internal operating procedures cannot create per se liability.  *See Flechsig v.*

*United States*, 991 F.2d 300, 304 (6th Cir. 1993).  The Court will therefore grant Defendants'

Motions on McMillen's negligence per se claims.

> iii.   *Negligent Hiring, Training, Supervision, and Retention (Count VI)*

McMillen claims negligent hiring, training, supervision, and retention against Supervisor

Windham and Supervisor Holt. [DE 1 ¶¶ 137–43].  Those Defendants move for summary judgment

on qualified-immunity grounds.  [DE 171; DE 172].

"Kentucky law recognizes that an employer can be held liable for the negligent supervision

of its employees."  *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003) (citing *Smith v.

Isaacs*, 777 S.W.2d 912 (Ky. 1989)); *see also McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 291

(Ky. App. 2009).  Yet the training, supervision, and management of employees is a discretionary

function "involving the exercise of discretion and judgment, or personal deliberation, decision,

and judgment."  *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 477 (Ky. 2006).  Supervisor Windham and

Supervisor Holt were management employees exercising discretion in seeking and implementing

appropriate management techniques.  [DE 1 ¶¶ 6–7].  Even if those techniques are ripe for

criticism, McMillen does not argue that Supervisor Windham and Supervisor Holt acted in bad

faith.   Because their functions were discretionary, they acted within the scope of their authority,

and acted in good faith, they are entitled to qualified immunity on the claims for negligent hiring,

training, and supervision.  *Yanero*, 65 S.W.3d at 521–22.

As to negligent hiring and retention, decisions of whether to terminate or suspend a

corrections officer for a policy violation is "clearly a discretionary act."  *Jefferson Cty. Fiscal

Court v. Peerce*, 132 S.W.3d 824, 833 (Ky. 2004), *as modified* (Feb. 23, 2004).  Similarly, the

hiring process is discretionary as long as the person being hired is not known to be incompetent.

*Yanero*, 65 S.W.3d at 528 (citing *Whitt v. Reed*, 239 S.W.2d 489, 491 (Ky. 1951)).  McMillen has

neither established nor argued that Supervisor Windham and Supervisor Holt had authority to hire, fire, or discipline employees. But even if McMillen has, McMillen does not deny that they conducted their duties in good faith or argue that they knowingly hired incompetent employees. Because their authority was discretionary, and they acted within the scope of his authority and acted in good faith, they are entitled to qualified immunity. *Yanero*, 65 S.W.3d at 521–22. Thus, their Motions are granted as to Count VI.

### b.  Assault (Count VII) and Battery (Count VIII)

McMillen asserts that Chris Johnson and Supervisor Holt committed assault when they "unlawfully directed force towards Gynnya under such circumstances as to create a well-founded fear of immediate peril" during the intake process. [DE 1 ¶¶ 144–48]. Similarly, McMillen asserts that Chris Johnson committed battery when he forcefully restrained Gynnya during the intake process. [*Id.* ¶¶ 149–53]. Defendants move for summary judgment on the respective claims. [DE 172-1 at 3016; DE 185-1 at 3116].

Kentucky law authorizes the use of physical force upon another person when an authorized official of a correctional institution "believes that the force used is necessary for the purpose of enforcing the lawful rules of the institution[,] . . . the degree of force used is not forbidden by any statute governing the administration of the institution[,] . . . and . . . if deadly force is used, its use is otherwise justifiable under this code." Ky. Rev. Stat. § 503.110. Gynnya was being held in a secure juvenile detention facility. The rules of the facility, codified in SOP 702, required Gynnya to remove her hoodie jacket during intake. [DE 61-4 at 590].[9] For the reasons outlined in Section

---

[9] Although the SOP reflects that "[a]ny juvenile cleared to be admitted and is combative, aggressive[,] or non-compliant will be secured in an Intake Holding Room until control is regained and the intake process can be safely completed," it does not forbid the use of force if a detainee refuses to comply. [DE 61 at 584].

II(B)(1)(a), Defendants' specific use of force in carrying out the search was both lawful and an objectively reasonable method to enforce the rules of the institution and potentially prevent contraband from entering the facility.  For these reasons, Chris Johnson and Supervisor Holt are entitled to summary judgment on Count VII and  Count VIII.

### c. False Imprisonment (Count IX)

McMillen brings false imprisonment claims Supervisor Windham and Supervisor Holt, alleging they "deprived Gynnya of her liberty when they restrained her in an isolation cell wrongfully, improperly, and without a claim of reasonable justification."  [DE 1 ¶ 155].  Those Defendants move for summary judgment.  [DE 171; DE 172].

"To constitute the injury of false imprisonment, there are two points requisite: (1) The detention of the person, and (2) the unlawfulness of such detention."  *Great Atl. & Pac. Tea Co. v. Smith*, 136 S.W.2d 759, 767 (Ky. App. 1939) (citation omitted).  These prerequisites must be "strictly enforced."  *Smith v. Stokes*, 54 S.W.3d 565, 566 (Ky. App. 2001).  In Kentucky, if a detainee is detained under judicial process, there is no false imprisonment. *Fultz v. Whittaker*, 261 F. Supp. 2d 767, 783 (W.D. Ky. 2003); *Evans v. Sir Pizza of Ky., Inc.*, No. CIV.A.09-86-KSF, 2010 WL 2365331, at *5 (E.D. Ky. June 11, 2010), *aff'd*, 476 F. App'x 605 (6th Cir. 2012); *Stokes*, 54 S.W.3d at 567.

The Shelby County District Court ordered Gynnya's detention after her arrest.  [DE 1 ¶ 28].  McMillen asserts that Gynnya was still falsely imprisoned because she was held in an isolation cell in violation of internal procedures.  [DE 186 at 3145].  But the undisputed facts show that Gynnya asked to remain in isolation during her time at Lincoln Village.  [DE 148-23 at 2819 ("Gynnya requested to stay in the isolation cell area and did not want to be placed with the rest of the female population")].  False imprisonment does not apply when the person consents to

confinement.  *See Banks v. Fritsch*, 39 S.W.3d 474, 479 (Ky. App. 2001) ("Kentucky cases define false imprisonment as being any deprivation of the liberty of one person by another or detention for however short a time without such person's consent and against his will, whether done by actual violence, threats or otherwise.").  Gynnya was thus lawfully confined under a court order and consented to the conditions of her confinement.  Summary judgment is therefore granted on Count IX.

### III.   CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, **IT IS ORDERED** as follows:

(1)     The Motion to Alter or Amend [DE 168] is **DENIED**.

(2)     The Motion for Summary Judgment by Supervisor Windham and Supervisor Holt [DE 171; DE 172] is **GRANTED IN PART AND DENIED IN PART**.

(3)     The Motion for Summary Judgment by Chris Johnson [DE 185] is **GRANTED IN PART AND DENIED IN PART**.

Copes to:     Counsel of record

34